200 N.J. Super. 620 (1985)
491 A.2d 1336
JEAN E. SKRIPEK, PLAINTIFF-APPELLANT,
v.
ANGELO R. BERGAMO, M.D., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 1984.
Decided May 2, 1985.
*623 Before Judges MICHELS, PETRELLA and BAIME.
Jean E. Skripek, appellant, argued the cause pro se.
Paul G. Nittoly argued the cause for respondent (Shanley & Fisher, attorneys, Mr. Nittoly, of counsel; Jeffrey S. Brown, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiff Jean E. Skripek appeals from a judgment of the Law Division entered on a molded jury verdict of no cause for action in favor of defendant Angelo R. Bergamo, M.D., and from a denial of her motion for a new trial.
Plaintiff instituted this medical malpractice action against defendant seeking to recover damages sustained as the result of a post-operative closed capsulotomy performed by him following breast augmentation surgery. Although plaintiff also charged defendant with breach of express and implied warranties and with negligence in performing the breast augmentation surgery as well as negligence in performing the post-operative closed capsulotomy, her principal claim and the sole theory upon which she pretried and tried the case was lack of informed consent. Specifically, plaintiff claims that defendant failed to advise her of the risks and the possible serious consequences *624 attendant to the closed capsulotomy. The facts developed at trial may be summarized generally as follows.
In November 1979, plaintiff consulted defendant for the purpose of eliciting information with regard to breast augmentation mammoplasty. Plaintiff, who was then 38 years old, in the process of obtaining a divorce and the mother of two children, "believed that beautiful, firm breasts would improve her physical appearance." Plaintiff admitted that defendant discussed the pros and cons of breast augmentation mammoplasty during the initial consultation. According to plaintiff, defendant told her that such surgery was "a marvel of science today that breasts can be returned to what you were born with. Many times they're even more beautiful." Defendant explained how prostheses would be used and that there was a possibility that the breasts would get hard. He also explained that scars would be "in the natural crevice of the breast line and that the scars would be tucked underneath and would not be visible." According to defendant, he explained the risks of this type of surgery and did not make any guarantees regarding the success of the procedure, particularly since plaintiff's breasts at the time of his examination were not symmetrical. It is clear from the proofs that defendant did not force or coerce plaintiff to undergo the surgery and gave her the opportunity to discuss with whomever she wanted whether or not to have such an operation.
In early December 1979, after discussing the surgery and its implications with her former husband, plaintiff returned to defendant's office and signed a consent form for the breast augmentation surgery and prepaid his fee. Plaintiff expressly authorized defendant to perform the augmentation mammoplasty. In signing the form, she also acknowledged that "no guarantees have been made to me as to the results of the procedure to be performed ... that there are risks, consequences and complications associated with all surgery" and that she "understood," among other things, that "the procedure may not be successful," and that "there may develop a firmness *625 of the breasts which may be due to excessive fibrous capsule forming around the implant, or for other reasons, a malpositioning of the implants which may be due to the manner in which the implant becomes firmly secured." The proofs at trial show that prior to signing the consent form, defendant reviewed it carefully with plaintiff to ensure that she understood its contents. According to defendant, he had plaintiff sign this special consent form because (1) there were discrepancies that existed in plaintiff's breast prior to surgery and he wanted to be sure that she understood that he was not promising her that they would be corrected, (2) she was married to an attorney and, perhaps more important, (3) she was in the process of a separation and a divorce. Although denied by plaintiff, defendant testified that he discussed other corrective procedures which would be performed, such as an excision of a mass of her right breast, a bilateral partial mastectomy, possible removal of her lower poles, excision of chronic granulation tissue, release of the contracture of the left mammary region and excision of the multiple lesions of her face and body.
On December 6, 1979, plaintiff entered Mountainside Hospital in Montclair, New Jersey, for the surgery. Before undergoing the surgery she executed the hospital's consent and operative permit which authorized defendant to perform the requested surgery. This form recited that "[t]he nature and purpose of the operation, possible alternative methods of treatment, the risks involved and the possibility of complications have been explained to [plaintiff]." After plaintiff signed the form, defendant performed the surgery. Plaintiff was pleased with the results. She saw defendant about a week later and felt that she looked fine. She returned to defendant about a month later in mid-January 1980 at which time defendant noticed that her right breast was a little hard, something she had not complained to him about. He told her to lay back and that he was going to give it a "little squeeze and it should soften it right up." Plaintiff permitted defendant to squeeze her breast but, according to plaintiff her breast remained hard.
*626 About a month later, in February 1980, plaintiff returned to defendant's office. She was still satisfied with her appearance, but defendant noticed that her right breast was still hard. Although plaintiff did not complain about her appearance nor was she unhappy with her right breast, defendant again told her to lie back, that he was going to give it another squeeze to soften it up. Defendant, however, did not explain to plaintiff that anything would happen except "it may hurt a little bit." She acceded to his request and laid back. He told her to hold his arm while he performed the procedure. According to plaintiff, defendant cupped his hands beneath her breast and squeezed and pushed. At this time she screamed because it was painful. She further testified that she could almost feel the palms of his hands touching and heard a loud crunch. She was so sore that she could not move; she had a throbbing pain and was light-headed. Defendant told her that she would be alright in a few minutes. However, when plaintiff arrived home she was extremely sore and her breast was "really red." The following day it discolored, turning black and blue. She called defendant and told him that she was extremely sore. He told her to take a hot shower, put hot compresses on her breast and massage it. After about a week the discoloration went away, but she noticed a bulge forming underneath the crease in her breast and that the scar was raising. She called defendant who, in plaintiff's words, responded "its all in my [plaintiff's] imagination."
In early April 1980, plaintiff saw defendant who examined her and told her that her right breast was the more natural looking of the two and that she ought to come back in six months. In July, 1980, before the six months passed, plaintiff fell and scraped her shoulder. She went to her gynecologist, who recommended that she seek plastic surgery because "there's a lot of gravel still in there." She immediately made an appointment with defendant and saw him either July 7th or 11th. Defendant examined plaintiff's shoulder and gave her a prescription to apply to prevent any scarring. He then examined *627 her breasts and told her that he would like to do further surgery on her left breast. Although plaintiff made an appointment for the surgery, she cancelled it. She decided not to go through further surgery because she wanted the right breast corrected since that was the one that was painful and uncomfortable.
Eventually plaintiff consulted Dr. Robbie Meyjer, a plastic surgeon, who performed several operations. Dr. Meyjer testified that when plaintiff came to him she had an hour glass deformity of the right breast because the implant had slipped below the bra line. He performed an opened capsulotomy on both breasts, releasing both implants: the left to soften the breast and the right to correct the deformity. Shortly after that operation plaintiff complained and told Dr. Meyjer that she was unhappy with the different levels of the folds underneath the breasts. Dr. Meyjer performed an open capsulotomy on the left breast but this time the result was that the fold of the left breast became lower than the right. Another operation was performed and plaintiff was pleased with the result.
Dr. Charles Scher, a plastic surgeon who testified for plaintiff, explained that a closed capsulotomy is a procedure whereby the breasts are squeezed causing a tear in the scar tissue which forms around the implants. Such a procedure allows the implants to be more mobile so that the breasts are less firm. An open capsulotomy is a procedure whereby an incision is made and the scar tissue is released. According to Dr. Scher, the risks in a closed capsulotomy are bleeding, discoloration, rupture of the implant, displacement of the implant and inability to actually perform the capsulotomy, i.e. failure to rupture the scar tissue. He further testified that in February 1980 it was accepted practice to advise a patient of these risks before performing the procedure. The alternatives to the procedure were an open capsulotomy or no treatment at all and it was accepted practice for the doctor to inform a patient of those alternatives. Dr. Scher was of the opinion that the closed capsulotomy caused plaintiff's right breast to turn black and *628 blue, and the implant to drop and that that in turn caused the scar to become more visible. He was of the opinion that it would have been a deviation from accepted medical standards if defendant did not inform plaintiff of the risks and alternatives involved in the procedure.
Dr. Steven LaVerm, defendant's expert testified that defendant had not deviated from the standard of care because he did not fail to advise plaintiff of the risks and alternatives to the closed capsulotomy. According to Dr. LaVerm, defendant's notes showed that he explained the capsulotomy procedure to plaintiff before performing it and he offered her the alternatives of doing nothing or doing an opened capsulotomy. However, Dr. LaVerm acknowledged that if defendant had not told plaintiff of the alternatives and the risks of the procedures he would have deviated from accepted medical practice.
At the conclusion of the proofs, the trial court submitted the case to the jury on special interrogatories. The jury found that defendant did not obtain plaintiff's "informed consent before performing the procedure known as a closed capsulotomy." However, the jury also found that had plaintiff been fully informed of the risks and alternative procedures before the closed capsulotomy was performed, a reasonably prudent person in her position would have consented and submitted to the procedure. The trial court thereupon molded the verdict and entered judgment in favor of the defendant of no cause for action. Plaintiff's motion for a new trial on grounds that (1) the trial court erred in charging the objective standard and in choosing this standard erred in failing to define a reasonably prudent person and (2) the verdict was against the weight of the evidence, was denied. Judge Neagle in the Law Division, in denying the motion, emphasized that both counsel were afforded ample opportunity before the jury charge was delivered to review it and neither objected to those portions here challenged nor did they object to them at the conclusion of the charge. This appeal followed.

*629 I.
Plaintiff contends for the first time on appeal that since defendant admitted to performing a closed capsulotomy procedure upon her without any consent, he thus committed a battery, entitling her to damages without regard to further proof. It is perfectly clear from a review of the record that plaintiff never charged defendant with committing a battery by performing the closed capsulotomy until she raised the issue in her appellate brief. She admits and there can be no question that neither the complaint nor the pretrial order asserted a claim based on battery. Moreover, during the course of the trial the trial court raised the possibility that the proofs might establish a battery within the principles discussed in Perna v. Pirozzi, 92 N.J. 446, 460-463 (1983), even though it thought the case was really an informed consent case and not a battery case. Plaintiff's attorney agreed. More importantly, plaintiff's attorney did not move to amend the pleadings to conform to the proofs and never requested a charge to the jury with respect to this tort. Under these circumstances this issue is not properly before the court and we will not consider it.
It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App.Div. 1959), certif. den., 31 N.J. 554 (1960)). Here, a claim based on the theory of battery was not pleaded by plaintiff in her complaint, was not included as an issue in the pretrial order and was not tried before the jury. Moreover, plaintiff's attorney did not even attempt to amend the pleadings to assert such a claim during trial notwithstanding the opportunity afforded him.
*630 Even if we were to ignore this necessary and fundamental principle of appellate review and consider the merits of plaintiff's claim it is perfectly clear on this record that plaintiff did not prove a battery case against defendant. Plaintiff's argument to the contrary ignores the evidence and distorts defendant's testimony in answer to questions propounded by plaintiff's attorney. Although defendant admitted that he did not obtain a written consent to perform the closed capsulotomy and acknowledged that there were risks involved in the procedure, commenting "I do not obtain consents for closed capsulotomies," defendant did not admit that he failed to obtain any consent at all to perform the procedure. His testimony is clearly to the contrary.
Moreover, "[p]laintiff concede[d] that on January 11, 1980 and February 1, 1980 she allowed defendant to squeeze her right breast." Since plaintiff conceded that she permitted defendant to perform the procedure she cannot now properly claim that it was performed without any consent. Finally, the proofs belie the fact that defendant performed the procedure on plaintiff without her consent.

II.
Plaintiff next contends that the trial court erred in instructing the jury to apply an objective standard in determining whether defendant was liable to her for the injuries sustained on the theory of informed consent. Specifically, she complains that the trial court instructed the jury to decide whether or not a reasonably prudent person would have consented to the closed capsulotomy procedure had she been adequately informed of the risks and alternatives thereto. Plaintiff argues that once the jury found that defendant had failed to obtain her informed consent to perform the procedure, he was guilty of medical malpractice and consequently the only issue left for the jury to consider was the quantum of damages. We disagree.
At the outset, since plaintiff specifically requested that the jury be instructed with respect to the objective standard she *631 cannot now charge that the instruction constitutes prejudicial error. Plaintiff's counsel submitted requests to charge to the trial court that included the following language:
The question is not what the plaintiff would have decided if properly advised, but what a reasonably prudent person in plaintiff's position would have decided if fully informed. In reaching your decision, you must consider the facts and circumstances that existed at the time consent was given and may not consider facts or circumstances that came to light thereafter.
* * * * * * * *
If you find that the doctor failed to give plaintiff all such information that a reasonably prudent medical practitioner would have given his patient under the circumstances, that a reasonably prudent patient under all of the circumstances would not have consented and submitted to the procedure had she been so informed, and that the procedure had such an effect in producing plaintiff's condition that reasonable men would regard it as a cause of the condition, your verdict would be for the plaintiff.[1]
During the course of trial and prior to instructing the jury, the trial court discussed at length with both attorneys the proposed charge. The first paragraph of the charge quoted above contained in plaintiff's request was read to the attorneys. The trial court inquired of them "Do you feel that that's warranted here?" Plaintiff's attorney acknowledged that it was and defendant's counsel agreed.
At the conclusion of the proofs the trial court, with slight modifications underlined below, instructed the jury in accordance with plaintiff's requested instructions as follows:
The question is not what the plaintiff would have decided if properly advised, but what a reasonably prudent person in plaintiff's position would have decided if fully informed.
In reaching your decision you must consider the facts and circumstances that existed at the time consent was given and may not consider the facts or circumstances that came to light thereafter.
* * * * * * * *
If you find, one, that the doctor failed to give plaintiff all such information that a reasonably prudent plastic-surgery specialist would have given his patient under the circumstances and, two, that a reasonably prudent patient *632 under all of the circumstances would not have consented and submitted to the procedure had she been so informed, and three, that the procedure had such an effect in producing the plaintiff's injury or condition that reasonable men would regard it as a cause of the injury or condition, your verdict would be for the plaintiff.
The trial judge then translated these charges into the following special interrogatories which he submitted to the jury:
Now, a jury verdict form has been prepared and will now be distributed to you so you may better follow my instructions in this area; and Question 1 reads, "Did defendant obtain plaintiff's informed consent before performing the procedure known as a closed capsulotomy?" If your answer to that is, yes, cease. That's the end of the case. But, if your answer is, no, then you go to Question 2.
Question 2 reads, "Had the plaintiff been fully informed of the risks and alternative procedures before the closed capsulotomy was performed would a reasonably prudent person in her position have consented and submitted to the procedure?" If your answer is, yes, that's the end of the case. Return your verdict. If, no, however, go on to 3.
Neither party objected to this portion of the charge.
"Elementary justice in reviewing the action of a trial court requires that that court should not be reversed for an error committed at the instance of a party alleging it." Bahrey v. Poniatishin, 95 N.J.L. 128, 133 (E. & A. 1920). In this regard, we repeat what our Supreme Court so appropriately observed in State v. Pontery, 19 N.J. 457 (1955):
The defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial. [at 471].
See also State v. Simon, 79 N.J. 191, 205 (1979); Titus v. Lindberg, 49 N.J. 66, 78 (1967); Fox v. Township of Parsippany-Troy Hills, 199 N.J. Super. 82, 88 (App.Div. 1985); State v. McNeil, 164 N.J. Super. 27, 33 (App.Div. 1978), certif. den., 79 N.J. 497 (1979); Gilborges v. Wallace, 153 N.J. Super. 121, 139 (App.Div. 1977), rev'd in part on other grounds, 78 N.J. 342 (1978); State v. Harper, 128 N.J. Super. 270, 277 (App.Div. 1974), certif. den., 65 N.J. 574 (1974); Venuto v. Lubik Oldsmobile, Inc., 70 N.J. Super. 221, 229 (App.Div. 1961); Schult v. H. & C. Realty Corp., 53 N.J. Super. 128, 136 (App.Div. 1958), certif. den., 29 N.J. 279 (1959). Consequently, we will not reverse the judgment under review on this ground.
*633 Beyond this, if here again we were to abandon another important principle of appellate review and turn to the merits of plaintiff's contention, we would have no hesitancy in concluding that the trial court properly applied the objective standard in instructing the jury in this matter. It is firmly settled in this State that the lack of informed consent falls within the broad category of medical malpractice and "is a negligence concept predicated on the duty of physician to disclose to a patient information that will enable him to `evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." Perna v. Pirozzi, supra, 92 N.J. at 459 (quoting Canterbury v. Spence, 464 F.2d 772, 780 (D.C. Cir.1972), cert. den., 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972)). See also, Calabrese v. Trenton State College, 162 N.J. Super. 145, 156 (App.Div. 1978), aff'd, 82 N.J. 321 (1980); Kaplan v. Haines, 96 N.J. Super. 242, 255-258 (App.Div. 1967), aff'd o.b., 51 N.J. 404 (1968). Under this doctrine, "the patient who consents to an operation is given the opportunity to show that the surgeon withheld information concerning `the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated.'" Perna v. Pirozzi, supra, 92 N.J. at 460 (quoting Canterbury v. Spence, supra, 464 F.2d at 787-788).
An action based on lack of informed consent is distinguishable from an action based on a total failure to obtain any consent. The latter is not a negligence concept. The "patient need not prove initially that the physician has deviated from a professional standard of care. Under a battery theory, proof of an unauthorized invasion of the plaintiff's person, even if harmless, entitles him to nominal damages." Perna v. Pirozzi, supra, 92 N.J. at 460.
Lack of informed consent cases, just as any other medical malpractice negligence action, require that the plaintiff prove not only that the defendant physician deviated from *634 accepted standards of medical care but that such deviation or medical malpractice was a proximate cause of plaintiff's injuries. See Toy v. Rickert, 53 N.J. Super. 27, 31-32 (App.Div. 1958); Parker v. Goldstein, 78 N.J. Super. 472, 480 (App.Div. 1963), certif. den., 40 N.J. 225 (1963). Proximate cause has been defined as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." Fernandez v. Baruch, et al., 96 N.J. Super. 125, 140 (App.Div. 1967), rev'd on other grounds, 52 N.J. 127 (1968). Stated differently, plaintiff must prove that defendant's conduct constituted a cause in fact of his injuries and loss. An act or omission is not regarded as a cause of an event if the event would have occurred without it. Kulas v. Public Service Elec. & Gas Co., 41 N.J. 311, 317 (1964); Henderson v. Morristown Memorial Hospital, 198 N.J. Super. 418, 428 (App.Div. 1985); see also Prosser, Torts, § 41, at 238 (4th ed. 1971). If the injury and loss were to occur in the absence of a physician's negligence or malpractice, then before responsibility may be visited upon the defendant the negligent conduct or malpractice must have been shown to have been a substantial factor in causing the harm. See State v. Jersey Central Power & Light Co., 69 N.J. 102, 110 (1976); Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463, 483 (1969); Restatement, Torts 2d, § 432(1) at 430 (1965). Thus, if plaintiff would have consented to the procedure had she been informed of the risks and alternatives, logic and fundamental justice dictate that the defendant should not be held liable for the injuries sustained as a result of the performance of the procedure even though he failed to inform plaintiff of such risks and alternatives.
The leading medical malpractice case holding that a patient bears the burden of proving the causal relationship between the physician's failure to disclose the risks and alternatives and the injury to the patient is Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093 (Sup.Ct. 1960), on motion for rehearing 187 Kan. 186, 354 P.2d 670 (Sup.Ct. 1960). All the major informed consent *635 cases in New Jersey cite this case, obviously recognizing its persuasiveness and authoritativeness in this area of the law. In this regard, we deem it worthwhile to repeat at some length what the Kansas Supreme Court stated in its second opinion in Natanson v. Kline, supra, concerning the patient's burden of proof in a lack of informed consent case:
The gravamen of the plaintiff's complaint was malpractice or the failure of the defendants to properly perform the duties which devolve upon them  a failure which resulted in the alleged injuries to the plaintiff. Thus it was incumbent upon the plaintiff to prove and establish (1) that the defendants failed to perform their duty; and (2) that the plaintiff's injuries were the direct and proximate result of such failure. [354 P.2d at 671-672].
Specifically, the Court stated that:
The question then remains whether such failure on the part of Dr. Kline to make a reasonable disclosure to the appellant was a proximate cause of her injury. As indicated in the opinion the mere fact that Dr. Kline was silent does not compel a verdict for the appellant. [354 P.2d at 673].
Finally, the Court held:
If, of course, the appellant would have taken the cobalt irradiation treatments even though Dr. Kline had warned her that the treatments he undertook to administer involved great risk of bodily injury or death, it could not be said that the failure of Dr. Kline to so inform the appellant was the proximate cause of her injury. [354 P.2d at 673].
The overwhelming majority of jurisdictions follow the principle that informed consent is a negligence cause of action and requires a showing of proximate cause between the failure to properly inform the patient and the injuries sustained. In fact, the rule possesses such support that the Maryland Court of Appeals has been led to state:
All courts recognizing the doctrine of informed consent require proof of proximate causation. The rule is that a plaintiff cannot recover under the doctrine unless he can prove by a preponderance of the evidence that he would not have given his consent to the proposed procedure had full and adequate disclosure been made at the time consent was originally given. Karp v. Cooley, 493 F.2d 408, 422 (5th Cir.), cert. denied, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974); Aiken v. Clary, 396 S.W.2d [668] at 676 [(Mo. 1965)]; Wilkinson v. Vesey, [110 R.I. 606] 295 A.2d [676] at 690 [(1972)]. [Sard v. Hardy, 281 Md. 432, 379 A.2d 1014, 1024 (1977)].
See also Canterbury v. Spence, supra, 464 F.2d at 790 ("there must be a causal relationship between the physician's failure to adequately divulge and damage to the patient"); Percle v. St. *636 Paul Fire & Marine Ins. Co., 349 So.2d 1289, (La. Ct. App. 1977), writ den., 350 So.2d 1218 (La.Sup.Ct. 1977) ("the duty to disclose should be governed by the legal standard of negligence which includes an objective test in establishing causation ..."); Cobbs v. Grant, 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1, 11 (1972) ("there must be a causal relationship between the physician's failure to inform and the injury to the plaintiff ... [t]hus an objective test is preferable ..."); Gerety v. Demers, 92 N.M. 396, 589 P.2d 180, 194-195 (Sup.Ct. 1978) (accepted an objective test for the causal relationship); Harnish v. Children's Hospital Medical Center, 387 Mass. 152, 439 N.E.2d 240, 244 (Sup. Jud.Ct. 1982) ("plaintiff must also show that had the proper information been provided neither he nor a reasonable person in similar circumstances would have undergone the procedure"); Scott v. Bradford, 606 P.2d 554, 559 (Okla.Sup.Ct. 1980) ("[i]n summary, in a medical malpractice action a patient suing under the theory of informed consent must allege and prove ... (2) if he had been informed of the risks he would not have consented to the treatment ...").
Without a test for proximate cause a physician's liability can only be based on either a hybrid negligence/battery theory or absolute/strict liability in tort theory. Both seem inappropriate and have been rejected in this State. In our view, therefore, there must be a causal relationship established between the physician's failure to inform the patient of the risks and alternatives attendant to the proposed surgery and the injuries sustained by the plaintiff.
This, however, does not end the inquiry. There is still a question as to whether to apply an objective or subjective standard for determining proximate cause. Although some jurisdictions differ as to whether the factual issues and proximate cause call for an objective or subjective standard, the majority and more persuasive view is set forth in Canterbury v. Spence, supra, 464 F.2d 772. In our opinion, the objective standard or test adopted in Canterbury best ensures that justice will be served. The rationale in Canterbury is normally *637 cited as the reason for choosing the objective standard in determining causation in an informed consent case. There, the court stated:
It has been assumed that the issue is to be resolved according to whether the factfinder believes the patient's testimony that he would not have agreed to the treatment if he had known of the danger which later ripened into injury. We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. To be sure, the objective of risk-disclosure is preservation of the patient's interest in intelligent self-choice on proposed treatment, a matter the patient is free to decide for any reason that appeals to him. When, prior to commencement of therapy, the patient is sufficiently informed on risks and he exercises his choice, it may truly be said that he did exactly what he wanted to do. But when causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: "Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?" And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.
In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.
Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product. [Canterbury v. Spence, 464 F.2d at 790-791].
Numerous cases have followed this rationale. See Cunningham v. United States, 683 F.2d 847, 849 (4th Cir.1982); Gerety v. Demers, supra, 589 P.2d at 194-195; Cornfeldt v. Tongen, 262 N.W.2d 684, 701 (Minn.Sup.Ct. 1977), after remand, 295 N.W.2d 638 (Minn.Sup.Ct. 1980); Cobbs v. Grant, supra, 104 Cal. Rptr. at 516-517, 502 P.2d at 11-12; Percle v. St. Paul Fire & Marine Ins. Co., supra, 349 So.2d at 1300-1301. But see *638 Scott v. Bradford, supra, 606 P.2d at 558-59 (which appears to be the only court that affirmatively considered the issue and chose the subjective test). Arguing against this minority view some courts have noted that the patient's death "would perhaps bar recovery [under the subjective test] because of the unavailability to the patient's testimony, which is essential," Percle v. St. Paul Fire & Marine Ins. Co., supra, 349 So.2d at 1301, and that the "reconstruction of his hypothesized state of mind seems a harsh evidentiary requirement." Cornfeldt v. Tongen, supra, 262 N.W.2d at 701. Additionally, as noted in Cornfeldt the objective test "is probably the test a jury applies in evaluating the credibility of a patient's testimony under the subjective standard." Id.[2]
Accordingly, we hold that the trial court's charge applying the objective standard for determining proximate cause was proper.

*639 III.
All of the other issues of law raised are clearly without merit and require no further discussion including plaintiff's contention that the trial court erred in denying her motion for a new trial. See R. 2:11-3(e)(1)(C) and (E). The denial of that motion did not constitute a manifest denial of justice.
Accordingly, the judgment and order under review are affirmed.
NOTES
[1] Plaintiff's requested charge and the charge given the jury are almost verbatim with the Model Jury Charges concerning "Informed Consent". See Model Jury Charges-Civil, Section 5.28[E] (approved by the New Jersey Supreme Court Committee on Model Charges, Civil 1978).
[2] In addition to the case law discussed above at least 10 state legislatures have passed statutes governing the principles of informed consent. These states are Arkansas, Florida, Maine, Nebraska, New York, North Carolina, Texas, Utah, Vermont and Washington. Typical is the New York statute which essentially codifies the law as expressed in Canterbury and its progeny. In full this statute provides:

LIMITATION OF MEDICAL MALPRACTICE ACTION BASED ON LACK OF INFORMED CONSENT.
1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.
2. The right of action to recover for medical malpractice based on a lack of informed consent is limited to those cases involving either (a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body.
3. For a cause of action therefor it must also be established that a reasonably prudent person in the patient's position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought.
4. It shall be a defense to any action for medical malpractice based upon an alleged failure to obtain such an informed consent that:
(a) the risk not disclosed is too commonly known to warrant disclosure; or
(b) the patient assured the medical practitioner he would undergo the treatment, procedure or diagnosis regardless of the risk involved, or the patient assured the medical practitioner that he did not want to be informed of the matters to which he would be entitled to be informed; or
(c) consent by or on behalf of the patient was not reasonably possible; or
(d) the medical practitioner, after considering all of the attendant facts and circumstances, used reasonable discretion as to the manner and extent to which such alternatives or risks were disclosed to the patient because he reasonably believed that the manner and extent of such disclosure could reasonably be expected to adversely and substantially affect the patient's condition. [N.Y.Pub.Health Law § 2805-d; emphasis supplied].