256 N.J. Super. 657 (1992)
607 A.2d 1044
HAMILTON, JOHNSTON, & CO., INC., PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
CHARLES L. JOHNSTON, JAMES C. DRAGON, DEBORAH L. GOCHENOUR, AND JOHNSTON, DRAGON & ASSOCIATES, DEFENDANTS-RESPONDENTS/THIRD-PARTY PLAINTIFFS-CROSS-APPELLANTS,
v.
JAMES R. HAMILTON, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 7, 1992.
Decided June 1, 1992.
*660 Before Judges ANTELL, LONG and BAIME.
Edward M. Shaw argued the cause for appellant (Greenbaum, Rowe, Smith, Ravin & Davis, attorneys; Stillman, Friedman & Shaw, of counsel; Bruce D. Greenberg, on the brief; Edward M. Shaw, Bruce D. Greenberg and Valerie J. Watnick, on the reply brief).
JoAnne Byrnes argued the cause for respondents (Glynn & Byrnes, attorneys; JoAnne Byrnes, of counsel and on the brief and reply brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
Third-party defendant James R. Hamilton and defendant Charles L. Johnston together entered the business of a financial consulting service which they incorporated under the name of Hamilton, Johnston, & Co. Inc. (hereinafter "plaintiff"), around January 1977. The firm was joined by defendants James C. Dragon and Deborah L. Gochenour in 1983. Differences arose, and defendants Johnston, Dragon and Gochenour left plaintiff's firm. In October 1988 they formed a new concern under the name of Johnston, Dragon & Associates, which is also a defendant herein. At the time of the breakup Johnston owned 10% of plaintiff's outstanding corporate stock and Hamilton held *661 90%. Johnston contends that he was fired from his position with plaintiff by Hamilton.
Plaintiff instituted this action against defendants in September 1989. Its amended complaint alleges misappropriation of trade secrets and customer requirements, interference with employment relationships, improper solicitation of plaintiff's customers and conspiracy. In bringing the action, plaintiff sought injunctive relief and damages. Defendants denied the material allegations of the complaint and counterclaimed for distribution of their shares in plaintiff's profit sharing and retirement plan, tortious interference with defendants' ability to earn a living and breach of certain fiduciary responsibilities by Hamilton. Johnston also alleged that his employment was wrongfully terminated by Hamilton in breach of an oral contract between them.
After a two-week trial a judgment was entered on December 7, 1990, and, after post-judgment motions, an amended judgment was entered on January 11, 1991. By its terms, the trial court dismissed plaintiff's claim of unfair competition, but determined that defendant Johnston, Dragon & Associates had plagiarized plaintiff's client report form, thereby committing a trademark infringement. No compensatory damages were found, but defendant Johnston, Dragon & Associates, Inc., was ordered to pay plaintiff $10,000 in punitive damages. Defendants were also enjoined from utilizing "the format and text of Hamilton & Co.'s work products." "Hamilton & Co." is the name by which plaintiff is now known.
The trial court also ordered that plaintiff pay defendants their interests in plaintiff's profit sharing and retirement plan as of December 31, 1988, plus prejudgment interest, totaling $104,439.30 for Johnston, $37,149.84 for Dragon, and $10,458.70 for Gochenour. In addition, plaintiff was ordered to pay Johnston $55,000, "representing the fair value of his shares in Plaintiff Corporation as of August 31, 1988, plus pre-judgment interest in the amount of $9,072.60." Plaintiff was also ordered *662 to pay defendants' attorneys the sum of $2,500 as fees relating to defendants' claims in the Profit Sharing and Retirement Plan, and $7,500 relating to Johnston's claim "for redemption of his shares of stock in Plaintiff." Plaintiff was further ordered to pay Johnston $8000 for his accountant's fees relating to his claim for the shares of stock and Johnston was ordered to pay $1,250 to plaintiff for the services of a court-appointed expert and $180 for a deposition. Finally, plaintiff's cross-motion for attorney's fees was denied.
Plaintiff first contends that the trial court erred in taking jurisdiction over the individual defendants' profit sharing claims on the ground that the federal Employee Retirement Income Security Act ("ERISA") 29 U.S.C.A. § 1001 et seq., creates exclusive federal jurisdiction over actions involving breaches of fiduciary duties with respect to covered plans. See 29 U.S.C.A. § 1132(e). The trial court did not consider this issue because it was not seasonably raised during the trial. The question of jurisdiction is usually recognized as an exception to the general rule that an appellate court will decline to consider issues not properly presented to the trial court when there was an opportunity to do so. Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973); Saul v. Midlantic National Bank/South, 240 N.J. Super. 62, 82, 572 A.2d 650 (App.Div.), certif. denied, 122 N.J. 319, 585 A.2d 338 (1990). R. 4:6-7 states: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the matter except as otherwise provided by R. 1:13-4." R. 1:13-4 deals only with the duty of a court which lacks subject matter jurisdiction to transfer the matter to the proper tribunal. We will therefore consider the matter as though it had been properly raised below.
Defendants agree that plaintiff's Profit-Sharing Retirement Plan is covered by ERISA, and that federal law governs under the broad preemption provision of 29 U.S.C.A. § 1144. The issue here is whether this case comes within the concurrent *663 jurisdiction set forth in 29 U.S.C.A. § 1132. Subsection (e)(1) provides:
Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.
29 U.S.C.A. § 1132(a)(1)(B) provides:
A civil action may be brought 
(1) by a participant or beneficiary 
....
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.
Paragraph 8 of plaintiff's Profit-Sharing Retirement Plan concerns distribution upon termination of employment. Paragraph 8.2 allows the plan's committee to determine, "in its sole discretion," the time and manner of payment of the participant's vested interest, provided that the commencement of benefits not be postponed later than 60 days after the plan year of the participant's normal retirement date.
Plaintiff argues that this granting of sole discretion removes defendants' claims from the scope of 29 U.S.C.A. § 1132(a)(1)(B). According to plaintiff, defendants must prove more than that benefits were due to them under the terms of the plan; they must prove "that Trustee Hamilton breached his ERISA-defined fiduciary duties to them by `arbitrarily and capriciously' abusing his discretion." We disagree.
Defendants here make no claim regarding "ERISA-defined fiduciary duties," as set forth in 29 U.S.C.A. §§ 1104-1109. They claim only that benefits are due to them now under the plan. We differentiate between fiduciary duty, which is not in issue here, and an abuse of the discretion which the terms of the plan grant to the committee. Since the terms of the plan here grant discretion to the committee to pay the benefits due now or later, and since there is no claim that the trustee or committee has breached any "ERISA-defined fiduciary duties" *664 or any other provision of ERISA, we regard this as an action to recover benefits due under the terms of the plan pursuant to 29 U.S.C.A. § 1132(a)(1)(B) and therefore subject to the concurrent jurisdiction of the state and federal courts.
Plaintiff relies on Young v. Sheet Metal Workers' International Assoc. Production Workers Welfare Fund, 112 Misc.2d 692, 447 N.Y.S.2d 798 (Sup.Ct. 1981). There, some 200 employees were terminated from membership in the subject welfare fund because the employer's contributions were inadequate to support continued coverage. Id. at 693, 447 N.Y.S.2d at 799. Plaintiffs, the president and negotiating committee of the local union, sought to enjoin the fund from terminating the memberships, alleging that the fund's fiduciary, its board of trustees, "was motivated by bad faith, fraud and arbitrary and capricious conduct." Ibid. The court initially determined, after a trial, that plaintiffs did prove that the trustees' action was arbitrary and capricious, and made in bad faith. Ibid. However, to reach this determination, the court "considered and applied ... the fiduciary duties of and standards applicable to a fiduciary as established by the Employment [sic] Retirement Income Security Act (ERISA) 29 U.S.C. § 1001 et seq. and by the common law...." Ibid. Apparently, the trustees had either negligently or in bad faith failed to collect required contributions from the employer. 112 Misc.2d at 693-694, 447 N.Y.S.2d at 799-800.
On reconsideration, the court determined that it was without jurisdiction under 29 U.S.C.A. § 1132. The court cited H.R.Rep. No. 533, 93rd Cong., 2d Sess. 3 (1974), reprinted in 1974 U.S.Code Cong. & Admin. News, 4639, 5107:
The U.S. district courts are to have exclusive jurisdiction with respect to actions involving breach of fiduciary responsibility as well as exclusive jurisdiction over other actions to enforce or clarify benefit rights provided under title I [the Employee Retirement Income Security Act of 1974]. However, with respect to suits to enforce benefit rights under the plan or to recover benefits under the plan which do not involve application of the title I provisions, they may be brought not only in U.S. district courts but also in State courts of competent jurisdiction.
*665 Young, supra, 112 Misc.2d at 700, 447 N.Y.S.2d at 803. The court determined:
Upon the foregoing authority, the Court finds that the words "... under the terms of the plan" must be read restrictively. That is, actions falling within the scope of that exception include only those wherein the participant or beneficiary asks the Court, as in a typical contract action, to construe or apply the terms of the plan to the facts of his/her particular issue....
The instant action concerns itself not with the clarification or enforcement of benefits or rights as prescribed by the plan, but rather, with an effort by plaintiffs to forestall what they allege to be their wrongful removal from coverage by the plan. Such an action calls into question issues beyond the plan itself and removes this action from this Court's jurisdiction.
Ibid. (citations omitted).
Here, defendants' claims are not "a typical contract action" requiring construction of the terms of the plan. This action is concerned solely with obtaining benefits prescribed by the plan. Unlike Young, supra, there is no question of "wrongful removal from coverage" or "propriety of fiduciary conduct." Ibid. The issue here is whether the committee abused the discretion which the terms of the plan gave it. In contrast to Young, supra, this issue does not reach beyond the plan itself.
Plaintiff next contends that the trial court erred in ordering immediate distribution of the individual defendants' shares in plaintiff's profit sharing retirement plan, pointing out that Paragraph 8.2 gives the committee which administers the plan full discretion to determine the time and manner of payment. In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 108-109, 109 S.Ct. 948, 953, 103 L.Ed.2d 80, 91 (1989), the Supreme Court clarified "the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations," explaining that the federal courts had adopted the arbitrary and capricious standard developed under the Labor Management Relations Act, 29 U.S.C.A. § 186(c). Looking to "established principles of trust law," the Court determined that this standard of review was appropriate when, as here, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to *666 construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956, 103 L.Ed.2d at 95.
Although the trial court here did not clearly enunciate this standard, by necessary implication from its use of the phrase "arbitrary and capricious" when asking Hamilton why he decided not to make the early distribution, it found that Hamilton's denial was arbitrary and capricious. The court rejected Hamilton's testimony that payment of defendants' claims would harm the fund because "it would be difficult to find an investment advisor to manage the funds." This finding of fact was based on sufficient credible evidence in the record, specifically the countering testimony of Dragon, on the basis of which the judge concluded that "investment managers clamor to be the advisor to consultants such as the parties to this matter." Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
The court further rejected Hamilton's testimony that his policy was to make distributions prior to retirement only in the event of hardship. Again, Dragon's credible testimony was that Hamilton told him that company policy was to make lump sum payments to departing employees. D-15, a memo entitled "Early Distributions from Profit-Sharing Retirement Plans," prepared by plaintiff's accountant, lists four individuals who received early distributions from plan 001, and the amounts, in 1983 through 1986, and two individuals who received early distribution from plan 002, and their amounts, in 1987. Hamilton explained that the first four early distributions were covered by a different plan; only the latter two were covered by the plan in question here, and they were both hardship cases. He complained that it was his policy to make it a "retirement plan not a departure incentive plan."
However, this contradicts the stated purpose of the plan in paragraph 1.2: "The purpose of the Plan is to provide retirement benefits and prior to retirement, certain death and termination benefits, for eligible employees through a fund created *667 solely by contributions from the net profits and surplus of the Company's business." (emphasis added). Thus, although the court did not cite this provision, it was entirely justified in finding that Hamilton's hardship policy was a "guise," and that "defendants should receive the same treatment" as other departing employees.
Plaintiff also argues that the trial court erred in selecting December 31, 1988, as the valuation date for defendants' interests in the profit sharing plan. It maintains that the correct date was December 31, 1987. The issue of the proper valuation date was not raised below and will not be considered on review. Nieder v. Royal Indemnity Ins. Co., supra, 62 N.J. at 234, 300 A.2d 142. In Skripek v. Bergamo, 200 N.J. Super. 620, 629, 491 A.2d 1336 (App.Div.), certif. denied, 102 N.J. 303, 508 A.2d 189 (1985), the court declined to consider a theory of medical malpractice which was raised for the first time on appeal. Its refusal to review plaintiff's claim was regarded as a "necessary and fundamental principle of appellate review." Id. at 630, 491 A.2d 1336. Similarly here, plaintiff had every opportunity to raise the issue below but failed to do so.
In any event, as plaintiff points out, paragraph 6.1 of the plan, on which it relies, sets forth the valuation date for retirement purposes only. Although plaintiff contends that this should also be utilized for a non-retiring departing employee, we see no good reason why this should be done. Moreover, the trial court's utilization of the 1988 date appears to be reasonable since each of the individual defendants left plaintiff's employ in the latter half of that year.
As to plaintiff's contention that it is the wrong party to be ordered to distribute the funds, this also was not raised below. However, in our view the entry of judgment against the employer and not the plan clearly qualifies as an "error or omission ... of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. 29 U.S.C.A. *668 § 1132(d)(1) provides: "An employee benefit plan may sue or be sued under this subchapter as an entity." In Gelardi v. Pertec Computer Corp., 761 F.2d 1323 (9th Cir.1985), the court cited this section, as well as 29 U.S.C.A. §§ 1132(a)(1)(B) and 1144(a), and concluded: "ERISA permits suits to recover benefits only against the Plan as an entity." Id. at 1324. Other courts have also determined that an employer is not a proper party in an employee's suit to recover plan benefits under ERISA. Boyer v. J.A. Majors Co. Employees' Profit Sharing Plan, 481 F. Supp. 454, 458 (N.D.Ga. 1979); Barrett v. Thorofare Markets, Inc., 452 F. Supp. 880, 884-885 (W.D.Pa. 1978); Cohen v. Equitable Life Assurance Soc., 196 Cal. App.3d 669, 242 Cal. Rptr. 84, 87 (Ct.App. 1987).
The matter will be remanded to the Chancery Division to enable defendants to join the profit sharing retirement plan as a third-party defendant pursuant to R. 4:8-1a, "by leave of court."
Plaintiff challenges the awards against it of pre-judgment interest, attorneys' fees and accountants' fees, as to Johnston's claim for his stock. Plaintiff's major argument is that Johnston arbitrarily rejected Hamilton's pretrial offer, citing the trial court's findings: "Since the court has found that formula does not apply, but that the standard should be fair market value, Hamilton was closer to being correct than was Johnston." Plaintiff cites N.J.S.A. 14A:12-7(8)(d), which provides that interest shall not be allowed "if the court finds that the refusal of the shareholder to accept any offer of payment was arbitrary, vexatious, or otherwise not in good faith." Plaintiff further contends that the award of counsel fees was an abuse of discretion since the trial court failed to consider the relevant factor of Johnston's arbitrary action. However, since the trial judge should have applied the formula set forth in the shareholders agreement for valuing Johnston's stock, as we explain further in this opinion, Hamilton was not closer than *669 Johnston to being correct, and the premise for plaintiff's argument fails.
As to attorneys and accounts fees, this is nowhere provided for in the shareholders agreement. N.J.S.A. 14A:12-7 cannot support a fee award because the action herein was not taken pursuant to that statute; it is an action based on contract. Thus, since the shareholders agreement is being enforced, Johnston is not entitled to any counsel fee on this claim.
Paragraph 6 of the shareholders' agreement of April 10, 1984, requires the corporation to purchase the stock owned by a shareholder who has died. If the corporation is unable to do so, the surviving shareholder has an option to purchase the deceased shareholder's stock. The purchase is to be at the "price and on the terms provided in paragraph 8 hereof." Paragraph 6(b) provides that if the corporation is unable to make the purchase, and the surviving shareholder elects not to, then "the Corporation shall be dissolved and its business and assets liquidated."
Paragraph 7(a) of the agreement provides that a "Sale Event" shall occur upon the incompetence or disability of a shareholder, or "the cessation of a Shareholder's full time employment with the Corporation for any reason whatsoever other than death." Paragraph 7(b) gives the corporation a first option to purchase the selling shareholder's shares upon the occurrence of a sale event, "at the price determined in paragraph 8 below." If the corporation fails to exercise its option, then the remaining shareholder shall have an option to purchase the stock also "at the price determined in paragraph 8 below." Paragraph 7(e) provides:
If the Corporation and/or the Remaining Shareholder do not elect to purchase all of the Common Stock of the Selling Shareholder, then the Corporation shall be dissolved and its business and assets liquidated. Such liquidation and dissolution shall be prosecuted by them with all reasonable speed and the distribution of assets of the Corporation shall be made as promptly as possible in accordance with the rights of the creditors and Shareholders of the Corporation.
*670 Paragraph 8 sets the purchase price at the corporation's book value plus the average of its net sales for the year of the death or sale event, the preceding year and the following year, multiplied by the percentage owned by the deceased or selling shareholder.
With no further explanation, the trial judge found:
An original shareholders agreement was amended in 1984, basically to put key man insurance in place to fund a redemption from either shareholder in case of death. A policy was purchased on Hamilton's life in the face amount of $1 million: none was purchased on Johnston's life. Although the agreement called for a payout based on a formula for ascertaining the value of each share, it is clear that the parties did not intend that formula to be the source of valuation for a redemption caused by something other than the death of a shareholder. The formula was created to set the value of Hamilton's shares to be equivalent to the key man insurance policy which the corporation bought.
We disagree with the trial court's determination that the parties did not intend that the formula set forth in paragraph 8 of the agreement be utilized "for a redemption caused by something other than the death of a shareholder." Apparently, it overlooked paragraph 7 of the agreement. This paragraph clearly provides that the formula of paragraph 8 is to be the source of valuation for a "sale event," which includes incompetence, disability and cessation of full time employment with the corporation for any reason other than death.
As defendants point out, Hamilton admitted that the shareholders' agreement was "valid and binding." The court gave no reason for declining to enforce it except that dissolution was "too harsh for the circumstances of this matter" and Johnston would be better off without it. However, Johnston has consistently sought specific enforcement of the agreement, and the court erred in voiding an otherwise binding contract because it felt it is "too harsh."
We further disagree with the court that N.J.S.A. 14A:12-7 applies here "because the majority stockholder acted oppressively and unfairly to the minority." Defendants did not bring their action under that statute. In their counterclaim and third-party complaint they demanded specific performance of the *671 shareholders' agreement and dissolution of plaintiff pursuant to that agreement. They also alleged that Hamilton violated "the minority shareholder doctrine in that he misused his position to his private advantage," but cited no statute or other authority and asked for no specific relief regarding this allegation. Defendants' theory has consistently been that Johnston is entitled to enforcement of the shareholders' agreement. Defendants have never sought dissolution, appointment of a custodian or provisional director, or a sale of stock pursuant to N.J.S.A. 14A:12-7.
Plaintiff cites Hughes v. Sego International Ltd., 192 N.J. Super. 60, 469 A.2d 74 (App.Div. 1983), which is similar to the instant case, but did not involve "precisely the same circumstances," as plaintiff claims. Hughes involved a close corporation owned by four shareholders, each with a 25% interest. Id. at 63, 469 A.2d 74. A shareholders' agreement, like the one here, provided primarily for the purchase of stock in the event of the death of one of the shareholders. Id. at 64, 469 A.2d 74. The agreement in Hughes, like the agreement here, valued the shares on the basis of the company's revenues. Ibid. However, the agreement in Hughes, unlike the agreement here, provided that the corporation and the other shareholders have "the right of first refusal at the same price that a deceased partner's shares would be valued if a partner wished to sell his stock during his lifetime." Ibid. Here, in contrast, the same price applies, pursuant to paragraph 7, not only if a stockholder wishes to sell during his lifetime, but also in the event of his incapacity or cessation of full time employment with the company for any reason.
In Hughes, supra, the other shareholders terminated plaintiff's employment because they were dissatisfied with his job performance, and plaintiff sought dissolution of the corporation "on the basis of unfair and oppressive treatment towards a minority shareholder." Ibid. (footnote omitted). The trial judge determined that the termination of plaintiff's employment constituted oppressive conduct under N.J.S.A. 14A:12-7(1)(c), *672 and ordered dissolution of the corporation, but permitted defendants to purchase plaintiff's stock. Defendants thus moved to purchase plaintiff's stock under the statute. Id. at 65, 469 A.2d 74.
N.J.S.A. 14A:12-7(8)(a) provides:
Upon motion of the corporation or any shareholder who is a party to the proceeding the court may order the sale of all shares of the corporation's stock held by any other shareholder who is a party to the proceeding to either the corporation or the moving shareholder or shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all of the circumstances of the case.
(a) The purchase price of any shares so sold shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12-7(1)(c).
N.J.S.A. 14A:12-7(1)(c) provides for dissolution, appointment of a custodian or provisional director, or sale of stock when, in a small corporation, "the directors or those in control ... have acted oppressively or unfairly toward one or more minority shareholders."
The trial court in Hughes, supra, utilized the formula in the parties' shareholders' agreement to determine the value of the stock for the purpose of the buy-out. 192 N.J. Super. at 66, 469 A.2d 74. The Appellate Division determined that since N.J.S.A. 14A:12-7(8)(a) required that the purchase price be the "fair value" of the shares, "it became incumbent upon the trial court to determine the `fair value' of the stock." Id. at 68, 469 A.2d 74. The trial judge had erred in utilizing the formula without first determining whether it established the fair value of the stock. Ibid.
As to the application of the shareholders' agreement, the Appellate Division said:
In reaching our result we have not lost sight of the fact that shareholder agreements are normally enforceable. This rule of law, however, does not help plaintiff since the agreement by its very terms does not apply. The agreement expressly provides that the formula contained therein shall be used to determine the value of stock if: (1) the corporation purchases a stockholder's stock after his death or (2) if a stockholder desires to dispose of his stock during his *673 lifetime and the corporation desires to exercise a right of first refusal. The parties, therefore, expressly provided the instances in which the valuation formula contained in the agreement would apply. Since the courts will not rewrite the contracts of litigants the terms of the agreement are not binding in a situation beyond the contemplation of the parties.
Id. at 69, 469 A.2d 74 (citations omitted).
Here, in contrast, the agreement expressly provides that it applies in the event a shareholder ceases employment with the corporation for any reason. Johnston's cessation of employment with plaintiff constituted a "sales event" under the agreement. By its own terms, this agreement is binding; this very situation is what the parties contemplated.
We conclude that Johnston is entitled to enforcement of the valid shareholders agreement of 1984 and to the valuation of his stock in accordance with the formula set forth in that agreement. Since there was conflicting evidence and no finding of fact regarding the valuation of Johnston's shares pursuant to the formula contained in the shareholders agreement, it is directed that a revaluation be made in accordance with the formula set forth in the shareholders agreement.
Defendants contend that the trial court erred in determining that defendants' quarterly reports to their clients were plagiarized from plaintiff and constituted trademark infringement. Plaintiff concedes that there was no trademark infringement but argues that "[d]efendants' tort was actually that of misappropriation."
The court found that defendants' reports were plagiarized because "most passages were copied word-for-word, with some passages ineptly rephrased but meaning the same as the original created for Hamilton & Co.'s clients." In addition, it found "the tables of statistics were presented in the same way as the Hamilton reports, as were the general design and logo," that defendants "obtained the prior Hamilton reports from their clients," and "all the data in the reports, except for the comparison made with Hamilton's Yardstick program, was available from other public sources," and that defendants were "careful *674 not to use the proprietary measure of comparison known as Yardstick." However, the "format/text of Hamilton's publications" was also found to be proprietary.
These findings were based on P-26, copies of plaintiff's June 30, 1989 Annual Report to the Board of Trustees, Sheet Metal Workers, Local 73, Pension Fund, and defendants' October 11, 1989 analysis of the investment performance of the same fund.
Hamilton testified extensively as to the similarities between these two documents, and complained that reports of other firms were "completely different." The court did not refer to the testimony of Johnston and another investment consultant, Ronald Karp, that all financial reports are similar. Karp explained:
[T]here aren't all that many different ways to represent this information.... You've got time periods. You've got asset classes. You've got managers. You can put some across the top and some down the side. But, I think that if you [com]pared the reports of twenty or thirty or forty different consultants, that there would be a remarkable similarity among them.
The formats of various consultants' reports are "all different ... but in essence they present the same information and wrap it slightly differently." According to Karp, a client choosing a consultant presumes "ability to process the data and calculate performance.... [W]hat differentiates consultants is the judgment that they ... bring to service the client, and also the confidence and rapport that they can develop with the client."
The court found trademark infringement but no compensatory damages, awarded punitive damages in the amount of $10,000, and enjoined defendants from "using the format and text of Hamilton & Co.'s workproducts."
In support of its misappropriation theory, plaintiff relies upon Columbia Broadcasting System, Inc. v. Melody Recordings, Inc., 134 N.J. Super. 368, 341 A.2d 348 (App.Div. 1975). There, plaintiff recorded original productions of musical compositions; it obtained either ownership of or the exclusive right to manufacture and sell the recording, and to "use the name and likeness of the artist in the promotion, advertising and sale of the recordings." Id. at 372, 341 A.2d 348. Defendant made *675 unauthorized "high quality reproductions" of plaintiff's original recordings and sold them to distributors for resale to retailers on defendants' "own distinctive label." Id. at 372-373, 341 A.2d 348. Although defendants did not "palm off" their products as those of plaintiff, the court determined that "[m]isappropriation and tortious exploitation of another's product may constitute unfair competition." Id. at 377, 341 A.2d 348. The court explained:
Permissible imitation entails the imitator bringing to bear its own efforts and resources in producing its own product, although it endeavors to simulate or ape the product of another.
* * * * * * * *
What is involved in this case is the direct taking by defendants of the artistic and highly creative work of plaintiff  the recorded performance of a specially arranged musical composition. Defendants have thus appropriated the unique product of CBS by rerecording its original records. The commercial injury ensues because defendants have accomplished this at a minimal cost and then sold their "original" duplicates for a substantial profit. The actionable unfairness of this practice inheres in a combination of factors  the substantial investment of time, labor, money and creative resources in the product by plaintiff, the utilization of the actual product by defendant, the misappropriation or use of the appropriated product by defendant in competition with plaintiff, and commercial damage to plaintiff.
Id. at 378-379, 341 A.2d 348 (citations omitted).
The situation here, in our view, is permissible imitation, not misappropriation. Defendants have utilized their own efforts, money and resources to produce their own product. The essence of a financial report is the data or figures, not the format or text. The trial court recognized that the data "was available from other public sources." Defendants have not appropriated any unique, artistic or creative work in copying passages from plaintiff's financial reports, presenting tables of statistics in the same manner, or utilizing the same "general design and logo." They have copied a "design or concept," not a finished product, 134 N.J. Super. at 379, 341 A.2d 348, as the court acknowledged. There is no basis for the court's conclusion that the "format/text of Hamilton's publications" was proprietary.
In addition, Johnston testified that he had "input in the origination of [the] language" allegedly misappropriated. *676 Hamilton did not deny this, and there was no fact finding on this point. If Johnston had partly authored the text in question, he should not be liable for its misappropriation, especially since Hamilton wrongfully terminated his employment.
So much of the amended judgment requiring plaintiff to pay Johnston $44,000, representing the value of Johnston's shares in plaintiff is vacated and the matter is remanded to the Chancery Division for a revaluation of Johnston's shares in accordance with the formula set forth in the shareholders agreement. The award to Johnston of attorneys and accountants fees on this claim is vacated. The award of $10,000 punitive damages to plaintiff for trademark infringement and the injunction restraining defendants from using the "format and text" of plaintiff's reports is reversed. So much of the amended judgment requiring payment by plaintiff of the individual defendants' interests in plaintiff's profit sharing and retirement plan and specifying the amounts is affirmed. The matter is remanded, however, with respect to this part of the amended judgment for further proceedings necessary for defendants to join the plan as a necessary third-party defendant to make the required payments.