252 N.J. Super. 580 (1991)
600 A.2d 485
SIDNEY BLITZ, PLAINTIFF-APPELLANT,
v.
JOHN HUTCHINSON, M.D., PAUL HARRIS, M.D., HACKENSACK MEDICAL CENTER, DEFENDANTS-RESPONDENTS, AND SHAFIE ARIF, M.D., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 1991.
Decided December 19, 1991.
*582 William C. Bochet argued the cause for appellant (Muscarella, Bochet, La Hiff, Peck and Edwards, attorneys; William C. Bochet and Linda M. De Brango on the brief).
Judith A. Heim argued the cause for respondent John Hutchinson, M.D. (Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, attorneys; Judith A. Heim of counsel and on the brief).
*583 Robert Wright argued the cause for respondent Paul Harris, M.D. (Melli & Wright, attorneys; Robert Wright of counsel and on the brief).
Lawrence H. Jacobs argued the cause for respondent Hackensack Medical Center (Hein, Smith, Berezin, Maloof, Spinella & Rogers, attorneys; Lawrence H. Jacobs of counsel; Carla H. Madnick on the brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
One of the pivotal issues raised in this medical malpractice case is whether the judge should have instructed the jury pursuant to Anderson v. Somberg, 67 N.J. 291, 338 A.2d 1, cert. denied, 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975), that each defendant had the burden to exonerate himself from liability. The judge declined to give such an instruction to the jury after insisting that he would throughout most of the trial. Another issued raised is whether reallocation of the burden of proof to plaintiff after essentially all the evidence had been presented so prejudiced plaintiff that a reversal is required. For the reasons which follow, we reverse the judgment of nonliability and remand for a new trial.

I
Plaintiff Sidney Blitz was admitted to the Hackensack Medical Center on August 25, 1985, with a history of cardiovascular problems. On September 3, 1985, defendant Dr. Hutchinson, a cardiothoracic surgeon, headed a surgical team which performed triple bypass surgery on plaintiff. Defendant Dr. Harris, also a cardiothoracic surgeon, was the first assistant who removed the saphenous vein from plaintiff's leg so it could be used as the conduit to bypass the blockage in the coronary artery. Defendant Dr. Arif, a fellow in cardiac surgery, was the second assistant. Once the bypass procedures were completed, *584 plaintiff's chest cavity was closed and he was placed in the recovery room.
While in the recovery room, it was observed that plaintiff suffered a sudden drop in blood pressure which caused him to go into shock. Plaintiff was returned to the operating room where an exploratory laparotomy was performed by Dr. R. Keys, a general surgeon, who was assisted by Dr. Hutchinson. Dr. Hutchinson found excessive bleeding into the abdominal cavity from a laceration in the right lobe of the liver that measured approximately one-half centimeter. The laceration was sutured by Dr. Hutchinson and plaintiff stabilized after blood transfusions. Plaintiff learned of the second surgical procedure four days later.
The medical malpractice complaint was filed on August 18, 1987, alleging that during the course of the triple bypass surgery, one, some or all of the defendants negligently lacerated plaintiff's liver. All defendants filed answers denying any malpractice. On June 7, 1990, counsel for defendant Dr. Arif was relieved from further representation of him. A jury trial was conducted over a four day period during which Dr. Arif did not participate.
Special interrogatories were propounded to the jury. The first question asked the jury to decide whether either one or more of the defendants were negligent "while performing coronary bypass surgery upon Plaintiff Sidney Blitz on September 3, 1985, which negligence was a proximate cause of injury to plaintiff's liver"? The jury was asked to answer "yes" or "no" as to each defendant. The jury answered five to one "No" as to each defendant. A judgment of no cause was entered based on the verdict of the jury.

II
Dr. Howard G. Greene, a board certified general surgery surgeon, testified as an expert for plaintiff. He stated that although it was obvious plaintiff's liver was lacerated during *585 the bypass operation, he had no way of knowing how the laceration exactly occurred because the cause of the laceration was not mentioned in the hospital records. Dr. Greene testified further that based on his own experience, a review of the medical literature and various reports, a laceration of the liver is not an accepted or recognized complication of coronary bypass surgery.
Dr. Greene testified further that a surgeon who properly performs a bypass operation will not injure the patient's liver because generally the surgeon will not be working near that organ. It was his view that there is no medically probable way that the liver can be lacerated while inserting a pericardial drainage tube, i.e., a tube which is inserted into the pericardium and into either one or both of the pleural spaces that is opened during the bypass surgery in order to allow drainage of any excess fluid. Beyond that, Dr. Greene maintained that based on plaintiff's hospital record, no pericardial tube was used during his operation. Dr. Greene opined that it was Dr. Hutchinson who deviated from accepted standards of medical care in the course of plaintiff's coronary bypass operation.
Dr. Hutchinson testified on his own behalf. He is a board certified general and thoracic surgeon and, since 1985, the Director of Cardiac Surgery at defendant hospital. He approximated that, prior to the date of plaintiff's surgery, he had performed 9,000 to 11,000 bypass operations, at the rate of three to four per day, and he explained that the risks commonly associated with such a procedure are: death, stroke, central nervous system problems, excessive bleeding, infection and post-pericardiotomy syndrome, such as febrile illness.
Dr. Hutchinson testified that during the bypass procedure, he stood on plaintiff's left side while Dr. Arif was on the right side. While the two of them were working as a team in plaintiff's chest cavity, Dr. Harris removed the vein from plaintiff's leg and then left the operating room, returning after the heart-lung machine had been turned off. He further stated *586 that if he inserted a pericardial tube it would have been inserted on the left side of plaintiff's chest. The record did not disclose whether he did or did not insert such a tube. To position such a tube into the pericardium, an incision has to be made on one side and a clamp with tube attached is blindly passed through the incision and maneuvered until it reaches the corresponding side of the heart. He stated that only a person on the left side of the patient's body can insert a tube on that side of the patient. He testified that Dr. Arif would have been the person to insert a pericardial tube into the right side of plaintiff's chest. However, on cross-examination, Dr. Hutchinson stated that he could not recall whether Dr. Arif actually inserted such a tube and there was no indication one way or the other in the hospital record.
In addition, Dr. Hutchinson explained that a patient's liver is occasionally exposed during a bypass operation. When opening the chest, if the lower part of the initial incision opens into the lower part of the peritoneum, the liver may be, but is not usually, exposed. Most importantly, counsel for the parties never asked Dr. Hutchinson how the laceration to plaintiff's liver actually occurred during the operation performed on plaintiff.
Dr. Harris testified and corroborated Dr. Hutchinson's account of his whereabouts and actions during plaintiff's operation. He also stated that, because he only removed the saphenous vein from plaintiff's leg, he did not do any work in the area of plaintiff's chest cavity.
Dr. Edward Foster Conklin, a cardiothoracic surgeon, testified as an expert for defendants. He too had performed a large number of bypass surgeries, 700 to 800. He stated that he was familiar with the risks and complication of this type of procedure, which include: death, infection, hemorrhaging, stroke, erythremia, loss of a leg, and perforation of one of the four chambers of the heart.
*587 Dr. Conklin reviewed all of the reports pertaining to plaintiff's operation and opined that his liver was lacerated when either Dr. Hutchinson or Dr. Arif passed a pericardial tube. It was his opinion that passing a pericardial tube could lacerate skin, muscle, peritoneum and pleural space, the intercostal arteries, the top and bottom of each rib, the colon, the liver, the heart, the small intestine and other organs.
Dr. Conklin further testified that placement of pericardial drainage tubes was a recognized part of any bypass surgery. He stated that failing to do so would constitute the "grandest malpractice." He explained that a patient's liver is in the operative field when a pericardial tube is passed; that is, the surgeon looks down at the left lobe of the liver and part of the right lobe and must blindly pass the pericardial tube from under the liver, then over top of it and into the pericardial cavity. Also, Dr. Conklin stated that he was aware of other times when patients' livers were lacerated by passing a pericardial tube. Indeed, he said such a laceration occurred in one of the 700 to 800 bypass operations he performed. He ruled out laceration by a scalpel for two reasons (1) it was to too rare, and (2) any lacerations from this instrument would have resulted in more extensive injuries to the skin and spontaneous rupturing.

III
On this appeal, plaintiff contends that he was prejudiced when the judge decided, for the first time after the last crucial witness (Dr. Conklin) testified, that the jury would be instructed on res ipsa loquitur rather than pursuant to Anderson v. Somberg, supra, as had been previously determined. He also contends that the jury should have been instructed pursuant to Anderson v. Somberg, supra.
In Anderson v. Somberg, supra, during the course of a surgical procedure, the tip of a rongeur (a device used to perform a laminectomy) broke off while being used in the *588 plaintiff's spinal canal and could not be retrieved. The resulting medical complications and permanent injuries which the plaintiff suffered were proximately caused by this imbedded fragment. Anderson, supra, 67 N.J. at 294-295, 338 A.2d 1. Since that situation was not a contemplated risk of the surgical procedure, the plaintiff sued the hospital and doctor who performed the surgery for negligence, the manufacturer of the instrument in strict liability, and its distributor for breach of warranty. Id. at 296, 338 A.2d 1.
Our Supreme Court held that since all of the named defendants had engaged in conduct which activated legal obligations by each of them to the plaintiff and the unconscious or helpless plaintiff suffered "an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery," the jury should have been instructed that the failure of any defendant to prove his nonculpability would trigger liability and that at least one defendant had to be liable. Id. at 298, 338 A.2d 1 (emphasis added). The Court equated this burden-shifting rule to that of "conditional" res ipsa loquitur. Id. at 299-300, 338 A.2d 1.
The Anderson majority felt that, at the close of all the evidence, an equitable alignment of the duties owed to the plaintiff required that the actual burden of proof be shifted to the defendants. Id. at 300, 303, 338 A.2d 1. The Court cautioned, however, that the rule should be applied only in "exceptional special cases," as where a defendant owes a special responsibility to the plaintiff, or "where the injury lay outside the ambit of the surgical procedure in question." Id. at 302, 338 A.2d 1. The Court also noted that where there is no evidence as to where the culpability of multiple defendants lies, such a burden-shifting rule would not be available as it might impose an equal hardship on an innocent defendant as on an innocent plaintiff. Ibid. Thus Anderson v. Somberg, supra, created a special rule of evidence based on a special responsibility analysis. Id. at 300-302, 338 A.2d 1; Wagner v. Deborah *589 Heart & Lung Center, 247 N.J. Super. 72, 79, 588 A.2d 860 (App.Div. 1991).
In Anderson, unlike the present case, it was inescapable that there was at least one defendant whose breach of a direct duty owing to plaintiff resulted in plaintiff's injury. Here, however, there was evidence presented by defendants' expert, Dr. Conklin, that the laceration of plaintiff's liver was a reasonably foreseeable risk of his operation since the liver is an organ within the ambit of that particular surgical procedure. Based on that evidence, the Anderson rule does not apply to this case.
Additionally, there is a reluctance by our courts to expand the Anderson holding to any situation other than the one presented in that case. See, e.g., Shackil v. Lederle Laboratories, 116 N.J. 155, 173, 561 A.2d 511 (1989) (court refused to apply a theory of "market share liability" to a products liability claim brought against manufacturers of DPT vaccine); Wagner v. Deborah Heart & Lung Center, supra, 247 N.J. Super. at 78-79, 588 A.2d 860 (suit against cardiothoracic surgeon who left small piece of surgical needle inside patient after it broke off during triple bypass surgery); Namm v. Charles E. Frosst & Co., Inc., 178 N.J. Super. 19, 31-33, 427 A.2d 1121 (App.Div. 1981) (suit against drug manufacturers and distributing companies of prescription drug DES). Indeed, our Supreme Court has noted that the Anderson rationale has never been duplicated in any subsequent case, "[i]t is limited to one factual context." Shackil v. Lederle Laboratories, supra, 116 N.J. at 173, 561 A.2d 511.

IV
Plaintiff contends that even if the judge was not required to charge pursuant to Anderson v. Somberg, supra, reallocating the burden of proof after essentially all of the evidence had been presented was so prejudicial as to require a new trial. We agree.
*590 Ordinarily, the party asserting there has been medical malpractice has the burden of proof on that issue as defined in Evid.R. 1(4). Skripek v. Bergamo, 200 N.J. Super. 620, 633-634, 491 A.2d 1336 (App.Div.), certif. denied 102 N.J. 303, 508 A.2d 189 (1985). However, there are cases where the burden of proof may vary depending upon a number of factors and circumstances such as "... the relative litigational strengths or weaknesses of the parties [and] the access of the parties to proof...." Romano v. Kimmelman, 96 N.J. 66, 89, 474 A.2d 1 (1984). Anderson v. Somberg, supra, is an example of a case where the burden of proof was placed on each defendant in a medical malpractice case to exculpate himself where plaintiff, because of unconsciousness, did not have access to the proofs. It is an undisputed legal proposition that allocation of the burden of proof is to be made by the trial judge.
We are unable to determine when precisely the judge allocated the burden of proof initially in this case. The transcript of the opening statements has not been supplied to us. Plaintiff called three witnesses to testify: Dr. Green, himself and his son. There was no discussion on the record about Anderson v. Somberg, supra, during any of that testimony. At the close of testimony from those three witnesses, plaintiff's counsel informed the court "the plaintiff has completed his case."
On appeal, plaintiff asserts that after the testimony of Dr. Green, who was the first witness to be called by plaintiff, the court stated its intention to charge the jury in accordance with the Anderson doctrine. Plaintiff's brief has no citation to any part of the record where that assertion is supported. We have searched the record and we are unable to find support for that statement. Nevertheless, we find suggestions in the record that discussions occurred off the record respecting the applicability of Anderson v. Somberg, supra, before plaintiff rested. The first support for this proposition is found in one of the motions made by counsel for defendant Dr. Hutchinson.
*591 At the end of plaintiff's evidence, counsel for Dr. Hutchinson made a motion, pursuant to R. 4:37-2(b), for a directed verdict and that motion was denied. The same counsel also made a motion "to take this case out of the purview of Anderson v. Somberg "because Dr. Green testified that it was defendant Dr. Hutchinson who deviated from the accepted standard of care." Counsel argued that because Dr. Green pointed "the finger directly at Dr. Hutchinson [that] takes the case out of the ambit of Anderson v. Somberg." A motion to remove the case from Anderson suggests that there had been some indications that the court would charge Anderson.
The judge denied the motion "to take the case out of the purview of Anderson v. Somberg." The judge stated:
This is a classic Anderson situation. An unconscious patient in a medical negligence case suffers a mishap to an unrelated organ in the course of medical treatment, and no one knows how it happened or who did it.
That's what Anderson is all about, and on that basis the only thing I think that the plaintiff is bound to establish as a prima facie element is that there was fault. In other words, a deviation from accepted standards, and once the plaintiff through Dr. Greene, as the plaintiff did here, established that in the ordinary course of events your liver isn't damaged as a result of a coronary bypass operation it's incumbent upon the defendants then to exculpate themselves.
The significance of that ruling is reflected in the fact that it was made immediately preceding the testimony given by defendant Dr. Hutchinson. The cross-examination conducted of him by plaintiff's counsel was neither lengthy nor searching in terms of how the liver was lacerated. Nor were any questions asked respecting his failure to make a notation in the hospital record whether a pericardial tube was inserted and if so, by whom. This was important since Dr. Green took the position that he could not tell how the laceration of the liver occurred since the hospital record contained no notation. Furthermore, Dr. Hutchinson was never asked whether lacerating the liver was an accepted complication of the bypass surgery.
The judge's insistence that the defendants had the burden of proof was further reflected in a ruling which refused to bar testimony by Dr. Conklin based on the net opinion rule. A *592 prolonged colloquy was conducted on that motion which included further discussions on the Anderson v. Somberg issue. At the end of this extended discussion the judge reaffirmed that he was relying on Anderson v. Somberg and stated he did not see anything in Dr. Conklin's report that removed the case from the purview of Anderson v. Somberg. As noted earlier, Dr. Conklin was the last crucial witness to testify.
Notwithstanding the many assurances by the judge that Anderson would be charged, after Dr. Conklin testified, the judge informed counsel apparently for the first time that he would not charge in accordance with the Anderson doctrine, but would instead charge res ipsa loquitur. By this time, according to counsel for Dr. Harris, Dr. Hutchinson had returned to the hospital to resume his busy operating schedule.
After the judge reallocated the burden of proof, Dr. Harris was the only remaining witness to testify. He stated that he only removed the vein from plaintiff's leg and that he did not perform any work in the chest cavity.
While hearing arguments as to whether Dr. Harris should be involuntarily dismissed from the case, the judge reflected on the uncertainty of his reallocation of the burden of proof by stating that the more counsel for Dr. Harris talked, "it becomes obvious that I should change my mind and go back to Anderson." The judge eventually denied Dr. Harris' motion.
Plaintiff argues that the trial judge's sudden change of ruling "fatally prejudiced" him. He contends that:
The Court led all to believe, including plaintiff's counsel, that defendants had the burden to present exculpatory evidence, rather than mere explanation. The court did so often and emphatically.... [A]fter discharging both Dr. Hutchinson and Dr. Conklin [as witnesses], the Court reversed its position and decided that it would apply res ipsa loquitur rather than the Anderson doctrine, thus shifting the burden of proof to plaintiff after all the key witnesses had already concluded their testimony.... Plaintiff based his proofs upon the Court's emphatic representations that the burden of proof thereupon shifted to defendants to exculpate themselves from the presumption of negligence. [Anderson, 67 N.J. at 302, 338 A.2d 1].
*593 The issue respecting Anderson v. Somberg presumably was presented below in the form of a request to charge the jury. See R. 1:8-7. Charges may be divided into three categories in terms of importance: (1) those concerning essential and fundamental issues, (2) those concerning substantially material matters, and (3) all other relevant and material subjects. State v. Green, supra, 86 N.J. 281, at 289, 430 A.2d 914 (1981); Wild v. Roman, 91 N.J. Super. 410, 413-414, 220 A.2d 711 (App.Div. 1966).
While the rule permits a request to charge to be presented to the trial judge at or before commencement of the trial, but before the close of the evidence, a judge ordinarily should not rule on the requests until the evidence has been concluded. R. 1:8-7 directs that the court shall "rule on the requests prior to closing statements." A ruling prior to that enhances the probabilities that the judge would be making abstract decisions before the court has heard evidence and legal arguments in the context and atmosphere of the trial. One of the functions of a request to charge is to draw from the court a declaration of the law applicable to a particular case. State v. Green, 86 N.J. 281, 289, 430 A.2d 914 (1981); Hoffman v. Trenton Times, 125 N.J.L. 450, 16 A.2d 814 (E. & A. 1940). Because a typical declaration of law is fact sensitive, a trial judge usually must wait until the close of the evidence before deciding what the charge will be.
Here, the judge did not exercise the usual restraint contemplated by R. 1:8-7 and wait until the evidence had been concluded. Even though the judge did not decide what charge to give the jury until the end of all the evidence, he was emphatic at crucial times prior thereto as to what his charge would be respecting Anderson v. Somberg, supra.
The Anderson issue dealt with an essential and fundamental question of who had the burden of proof. Once the allocation is made, the attorneys have a right to rely on that allocation. Changing the allocation of the burden of proof after essentially all of the evidence has been presented will invariably *594 lead to substantial prejudice. This potential for prejudice has been recognized in part by our Supreme Court when it likened the shifting of burdens of proof to sailing into "murky waters." State v. Gantt, 101 N.J. 573, 586, 503 A.2d 849 (1986). Few issues occur during a trial that are more important or more fundamental than the burden of proof.
We are persuaded that even though the judge was ultimately correct in not charging in accordance with Anderson v. Somberg, supra, the judge's repeated assurances that he would so charge had the clear capacity to prejudice plaintiff. We have no doubt that plaintiff's counsel has honestly represented that he refrained from engaging in a rigorous cross-examination of Dr. Hutchinson, and to a lesser extent Dr. Conklin, only because he did not wish risking the chance that he would exculpate Dr. Hutchinson. Even if that was in part caused by trial strategy, it was largely due to reasonable reliance on the court's unconditional assurances that the Anderson doctrine would be charged. As was observed in Buckley v. Estate of Pirolo, 101 N.J. 68, 79, 500 A.2d 703 (1985): "The parties should be permitted to present their cases in the context of what the law is ... rather than as the trial court misunderstood the law to be. In proceeding as it did here, the court created a `make believe' scenario, the legal equivalent of half a deck."

V
In addition to the prejudicial impact of reallocating the burden of proof after all the crucial witnesses had testified, plaintiff contends he was prejudiced further when the trial judge precluded cross-examination of Dr. Conklin respecting an article he attached to his report. Dr. Conklin testified that in his review of the medical literature, he found only one article in reference to laceration of a liver during the insertion of a chest tube. He attached that article to his report because he said he thought it was an "interesting observation" that another surgeon *595 had noted a similar injury. He did not testify, however, that he relied on the article in formulating his opinion.
Irrespective of the fact that New Jersey has not adopted the learned treatise rule as an exception to our hearsay rule, the court erred when it precluded counsel for plaintiff from questioning Dr. Conklin as to whether he believed the article was authoritative. If Dr. Conklin believed the article was authoritative, plaintiff's counsel could have used the article to attack the credibility of Dr. Conklin's assertion that lacerating the liver while passing a pericardial tube is an accepted complication of bypass surgery. See McComish v. DeSoi, 42 N.J. 274, 281, 200 A.2d 116 (1964). If only one liver laceration caused by inserting a pericardial tube has been written up in all the medical literature, and if only one laceration of the liver occurred in the 11,800 bypass operations performed by defendants and Dr. Conklin, and since there was no notation in the hospital record respecting whether such a tube was passed in this case, we are entirely satisfied that plaintiff suffered substantial prejudice by the ruling. This ruling has additional significance in view of the judge's subsequent reallocation of the burden of proof.
Viewed together, we are persuaded that the reallocation of the burden of proof after all of the crucial witnesses had testified coupled with the court's improper curtailment of cross-examination of the crucial witness for the defense on the vital issue of credibility, so prejudiced plaintiff as to deprive him of a fair trial with respect to all defendants except Dr. Harris. A new trial is therefore required.
We are also persuaded that the errors were harmless as to defendant Dr. Harris because the undisputed evidence is that he did nothing which could have lacerated plaintiff's liver. The judgment of no cause is therefore affirmed as to defendant Dr. Harris.
It has been stipulated that defendant Dr. Arif was an employee of defendant hospital as a fellow in cardiac surgery when he *596 served as the second assistant during plaintiff's bypass surgery. The same prejudicial errors that require a new trial as to defendant Dr. Hutchinson are also applicable to the hospital and Dr. Arif.
We have considered the remaining issues raised by plaintiff and find they are clearly without merit. R. 2:11-3(e)(1)(E).
The no cause of action as to defendant Dr. Harris is affirmed. The no cause for action as to defendants Dr. Hutchinson, Dr. Arif and the Hackensack Medical Center is reversed and the matter is remanded to the Law Division for a new trial.