724 A.2d 863

MARTHA MOGULL, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. CB COMMERCIAL REAL ESTATE GROUP, INC., DEFENDANT–APPELLANT/CROSS–RESPONDENT, AND GARY BEBAN, FRED SCHMIDT, JOHN FOSTER, JAMES J. DIDION, BOYD VAN NESS, AND STEVEN FLEMING, DEFENDANTS/CROSS-RESPONDENTS, AND HAROLD APPEL, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued February 18, 1999—Decided March 9, 1999.

54

56

Before Judges CONLEY, A.A. RODRÍGUEZ and KIMMELMAN.

*Donald P. Jacobs* argued the cause for defendant-appellant/cross-respondent and defendants/cross-respondents (*Budd, Larner, Gross, Rosenbaum, Greenberg & Sade*, attorneys; *Carl Greenberg*, of counsel; *Mr. Jacobs* and *Richard M. DeAgazio*, on the brief).

*Bruce L. Atkins* argued the cause for respondent/cross-appellant (*Contant, Scherby & Atkins*, attorneys; *Mr. Atkins* of counsel; *Mr. Atkins, Andrew T. Fede* and *Suzanne J. Liebman*, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Following a lengthy trial in this sex discrimination case, and in response to special interrogatories, a jury concluded that defendant CB Commercial Real Estate Group, Inc. (CB) had denied plaintiff certain employment benefits and had discharged her and had not presented legitimate nondiscriminatory reasons therefor. It awarded her compensatory and punitive damages totalling $6,500,000. Additionally, the trial judge awarded plaintiff $211,-460.13 in prejudgment interest, $14,249.10 taxed costs and $624,-150.20 counsel fees against CB.[1] Because we are convinced the

---

[1] Plaintiff also obtained a jury verdict of $87,201.07 and prejudgment interest of $12,293.04 against defendant Harold Appel. Subsequently, plaintiff and Appel, we are told, "entered into a settlement and stipulation of dismissal with prejudice."

jury charge contained fundamental errors which may well have affected the jury's proper application of plaintiff's burden of proof and CB's burden of going forward in a Law Against Discrimination (LAD) suit brought pursuant to *N.J.S.A.* 10:5-1 to -49, we reverse and remand. Since we cannot be sure that the errors did not taint both the discriminatory denial of employment benefits verdict and the discriminatory discharge verdict, we reverse the entire verdict and remand for a new trial against CB.

Both parties raise a number of other issues, some relating to evidence, some relating to damages and some relating to counsel fees. Since the matter must be retried, these issues are moot. We observe only that on retrial, we assume the punitive damage jury charge will reflect our decision in *Maiorino v. Schering-Plough Corp.*, 302 *N.J.Super.* 323, 355, 695 *A.*2d 353 (App.Div.), *certif. denied*, 152 *N.J.* 189, 704 *A.*2d 19 (1997). We also observe that CB may now be able to amend its answer to include plaintiff's alleged breach of her duty of loyalty as a defense, as opposed to a separate counterclaim. *And see McKennon v. Nashville Banner Publ'g Co.*, 513 *U.S.* 352, 115 *S.Ct.* 879, 130 *L.Ed.*2d 852 (1995). Finally, as to plaintiff's cross-appeal from the dismissal of the complaint against all individual defendants except Appel, we are convinced that aspect of the cross-appeal is without merit and requires no further opinion. *R.* 2:11-3(e)(1)(E). The retrial on remand, then, will be against CB only.

I.

Given our disposition of this appeal, we need not discuss at length the extensive evidence produced by both sides over the course of the thirty-four day trial. Suffice it to say that this litigation seems to have had its genesis when plaintiff, who had obtained her real estate license and began working in the real estate field in 1974, was hired in 1976 by Appel, who was at that time managing partner of Sutton & Towne, a real estate company in Paramus. Appel had been in the real estate field since 1957. Appel trained plaintiff and, for a year and a half, between 1977

and 1978, they had more than a working relationship which, ostensibly at that time, ended without adverse effects upon their ability to continue working together. They did so on a number of transactions, sharing the salesperson's commissions. They also worked on other transactions independently.

In 1980, Sutton & Towne was acquired by CB. Appel was brought in as a vice-president; plaintiff was employed as a broker-salesperson. Plaintiff ultimately was promoted to an associate vice-president; at the time of the trial, Appel was the managing officer of CB's Hackensack office. During the trial, plaintiff alleged that over the course of her years at CB from 1980 to her termination in 1992, she had been subjected to a course of long-term discrimination reflected by being excluded from various office activities and real estate transactions, undermining her relationship with long-term clients, denying her a fair share of commissions, failing to fairly investigate her complaints and, finally, terminating her.

Plaintiff's actionable claim of denial of employment benefits centers upon three real estate transactions, in which Appel received benefits that she did not.[2] She asserted this was so because of her sex and produced evidence from which a jury could have drawn such a conclusion. On the other hand, CB presented evidence of legitimate nondiscriminatory reasons for why it handled each of these transactions in the way it did, as well as for plaintiff's termination, which a jury as well could have accepted.

The transactions have been referred to as the 1989 Allstate transaction, the 1990 CBS transaction and the 1991 Edwards and Kelcey transaction. We set forth the evidence relating to them and to plaintiff's discharge. But, because the verdict here arose from the jury's determination that CB had not presented legiti-

---

[2] All of the transactions occurred after 1988. There were earlier incidents and transactions plaintiff claimed showed a pattern of discrimination. They are, however, not separately actionable as a result of a pretrial statute of limitations ruling not here challenged.

mate nondiscriminatory reasons for its challenged actions and we must, thus, consider this appeal in that context, we do no more than set forth CB's reasons as if they were true. *See St. Mary's Honor Center v. Hicks*, 509 *U.S.* 502, 509, 113 *S.Ct.* 2742, 2748, 125 *L.Ed.*2d 407, 417 (1993).

### Allstate

In 1989, Allstate was contemplating a major relocation in New Jersey which would involve the sale of its 150,000 square foot building in Murray Hill and relocation of 70,000 to 80,000 square feet of its office space. Plaintiff had previously done some work for Allstate, including the leasing of four offices of 20,000 square feet to 40,000 square feet. In the course of that work, plaintiff had developed a good relationship with Allstate's local manager of the property. Because it was ordinarily CB's policy to assign a salesperson who had a prior relationship with a potential client to that client's projects in the salesperson's area, plaintiff expected to be involved in the 1989 transaction. The transaction was to be handled by two teams, one to handle the sale, the other to handle the lease. Allstate did retain CB for the job, but with Appel as one of the members of the leasing team. Plaintiff was not selected to work on either team.

CB articulated the following legitimate, nondiscriminatory reasons for its decision concerning the Allstate transaction. CB and Allstate had been sister companies when both were owned by Sears. As of 1989, Allstate had been one of CB's national accounts for many years, providing on an average 125 transactions and approximately $3,000,000 in commissions per year. As a result, CB's national accounts group, comprised of salaried officers, regularly provided nationwide services to Allstate.

Jack Weber, a member of CB's national accounts group, had been responsible for the Allstate account on a national basis since 1986 or 1987. One of his responsibilities was to assist Allstate with relocation of regional headquarters throughout the country. Based in Chicago, near Allstate's corporate headquarters in Northbrook, Illinois, Weber dealt directly with Chuck Roth, an

Allstate employee who oversaw the disposition of surplus properties, and Bill Mosten, the head of Allstate's facilities group. Plaintiff did not know Roth or Mosten.

The 1989 transaction was very large and despite CB's past relationship with Allstate, Allstate was considering other real estate companies for the project. It was essential, therefore, in submitting its proposal to Allstate, that CB present their "strongest players on the team." Weber, Gary Beban, CB's president, and Boyd Van Ness, its Eastern Divisional Manager, determined that the brokers in CB's Piscataway office—CB's closest location to the Murray Hill location—were the most familiar with the Murray Hill area and therefore best able to provide the services Allstate needed. Plaintiff was in CB's Hackensack office.

CB assembled a sales team comprised of three brokers from the Piscataway office. For the leasing team, CB included two of those brokers but wanted to add a third member who would have a stronger leasing resume. Finding no broker with a suitable resume in the Piscataway office, CB ultimately selected Appel from the Hackensack office.

Appel had specialized in office leasing for almost forty years. He was also one of the top performers in all of CB. Each year, CB identifies the salespersons who have earned a place in the "Colbert Coldwell Circle," a group limited to three percent of the sales force. As of 1991, Appel had achieved a position in the Circle nine consecutive years. Boyd Van Ness, CB's Eastern Divisional Manager, testified that Appel's performance was "better than anybody in the east or the west"; Appel was the "most consistent performer in terms of getting in the Circle." Plaintiff's experience in office leasing, on the other hand, was limited. Between 1983 and 1988, she had handled only twelve office leases, only four of which were more than 5,000 square feet. Weber testified that he was "[l]ooking for exceptional people—not just competent people.... There's no doubt that [Appel] was the perfect choice."

## CBS

Plaintiff claimed that she discovered in 1990 that in 1987 Appel had excluded her from a leasing of space for CBS. CBS had become a client of hers in 1979, when she was instrumental in the leasing of office space for CBS from Hartz Mountain. She had received a commission of $75,000 for that transaction. Hartz Mountain, as a landlord, had agreed that if CBS took more space at that location, plaintiff would be entitled to a commission. Plaintiff thought such a transaction had occurred in 1987 and that she should have gotten a portion of Appel's commission. In April 1990, she complained to her resident manager and sought such a commission. Her request was denied in a June 1, 1990 memorandum from Joe Renizo, the then sales manager of the Hackensack office. According to CB's evidence, the 1987 lease was executed a number of years after CBS had vacated the premises covered by the 1979 commission agreement and, thus, was unrelated to the earlier transaction. Moreover, a different landlord was involved.

### The Edwards and Kelcey Transaction

In the mid–1970's, Sutton & Towne had obtained an exclusive representation agreement from Edwards and Kelcey (E & K), an engineering firm, and in 1978, when E & K entered into a long-term lease, both Appel and plaintiff shared equally in the commission. The 1978 lease provided for a commission, and thus a split between Appel and plaintiff, in the event of a renewal.

In 1991, Appel learned that E & K was using the services of competing brokers in a search of new office space. Without plaintiff's involvement or input, he obtained an exclusive representation agreement for CB with E & K. The options of renewing the existing 1978 lease or relocating were considered. In the event of renewal, plaintiff should have been entitled to commission, since renewals were governed by the 1978 lease. But there was no agreement entitling plaintiff to a commission on relocation.

Plaintiff, nonetheless, claimed that if E & K relocated, she would be entitled to a 50% share of the commission. Plaintiff's

employment contract with CB contained a provision that CB would decide any dispute she might have with another salesperson or broker. Arleigh Williams, CB's northeast regional manager, made an initial determination as to plaintiff's claim after discussing it with her. His June 19, 1992 memo gave her two alternatives: either 30% of the commission upon renegotiation/renewal or 20% of the commission upon relocation or renegotiation/renewal.

Plaintiff responded with a note dated June 29, 1992, stating: "Both options are unacceptable. Edwards and Kelcey is my account. I am a 50% partner whether they renegotiate or relocate." Williams then consulted with Van Ness, who noted that CB management has the final say in resolving commission disputes; he nevertheless told Williams "to go the extra mile" to try to satisfy plaintiff. Accordingly, Williams determined that plaintiff would receive 50% upon renegotiation/renewal or 20% upon relocation. He explained his reasoning in a memorandum dated August 17, 1992:

> A *relocation* of the tenant is outside the commission split agreement and intent of the original transaction; therefore, the team of Harold [Appel] and Roger, who secured the assignment to represent the tenant, will receive 80% of the salesperson's compensation, and Martha will receive a 20% referral ... [which] recognized Martha's original involvement with the tenant.

> [Emphasis added.]

Because the ultimate transaction with E & K was a relocation, plaintiff was given 20% of the commission in accordance with Williams's final determination. She claimed sex discrimination in the refusal to give her a 50% share.

## Discharge

In the five years preceding her termination, plaintiff's commission earnings were among the lowest in the Hackensack office. Those commissions were as follows: 1988, $46,000; 1989, $98,000; 1990, $31,000; 1991, $54,000; and 1992, $26,000. Plaintiffs' own doctor, Dr. Simring, testified that she had "acknowledged that her sales performance was very poor in the last few years."

In December 1991, plaintiff met with Arleigh Williams, CB's northeast regional manager, and Fred Schmidt, her resident manager. Schmidt told plaintiff that she should "cold canvass" to obtain business—i.e., make cold calls, go out and knock on doors. She did not think she should have to do this but, rather, that management should give her leads.

John Foster became resident manager of the Hackensack office on July 14, 1992, having been hired from another real estate company. One of his tasks was to improve the performance of the Hackensack office. On October 9, 1992, he met with plaintiff to discuss the projects she was working on. She had submitted an activity report listing five transactions. One of those was the E & K transaction, which she was not working on. One of the others was a renewal, not a new transaction. Another transaction was not exclusively hers or CB's; she was working on it with Weichert Realtors. Plaintiff indicated that another of the transactions on her activity list had only a 50% likelihood of closing and if it closed, her commission would have been only $2,000. The last of the listed transactions was one which she had told the client would be "difficult." Plaintiff explained her low productivity at that time by telling Foster that she "had just been taken off" the 1989 Allstate transaction.

Foster met again with plaintiff on October 15, 1992, at which point he terminated her. In a portion of his deposition read to the jury, Foster explained his reasons:

[I]n my October 9th meeting with Martha Mogull and the October 15th meeting with Martha Mogull, she spoke unlike anyone who was a broker or sales person that I had ever dealt with in almost 20 years in the business. She seemed as though she was out of touch with reality. She appeared to have a tremendous grudge against one individual [Appel], against the company. She was asking me for business. I'm not the procurer of business. I'm the manager in that office. The people in that office are entrepreneurs. Their responsibility is going out and finding potential transactions, consulting assignments, mortgage finances and making those things happen. I am there to assist and support them in every possible way.

This person in those two meetings with the statements that she made to me gave me the impression that she was not prepared to be able to make a living doing real estate brokerage activities, let alone carrying that business card. I thought I was

dealing with somebody that was out of touch with reality, when someone is sitting there ranting about 1981 and how she sold this project, and how they screwed her out of the leasing on it, and then they lost the project. And how her client in 1987, Allstate Insurance, who she told me that she had made innumerable deals with—yet she couldn't do a deal in Philadelphia with them. I didn't understand that. We have an office in Philadelphia. Why wasn't it referred?

I never got any answers to some of these questions. In essence, it was innumerable reasons from the things that she sat there and told me, and that's why I met with her again on the 15th. I thought well maybe somebody had a bad day. Maybe it was me that had a bad day. Maybe I wasn't understanding this thing properly. And on the 15th after listening to it again I made the determination that the individual was not capable of brokerage activities in that organization.

In 1992 to hear about what happened in 1981 and from what she told me, she was maliciously not given the brokerage assignment. I'm saying to myself 1981, 1992—that's like 11 years. Why is she sitting here talking to me. I couldn't understand it. I couldn't understand in 1989 when she told me she was very burned out, I'm not—pardon the expression—I'm not the Salvation Army. My income is based on a small salary and the revenues generated which make that office profitable. And my charge is to get that office as profitable as humanly possible; and this by what she told me on the 9th and the 15th was utterly not in her being able to fulfill that responsibility, and that was bringing in business.[3]

## II.

▮ New Jersey's Law Against Discrimination (LAD) makes it ·an unlawful employment practice, or unlawful discrimination:

For an employer, because of the ... age ... of any individual ... to discriminate against such individual in compensation or in terms, conditions or privileges of employment....

[*N.J.S.A.* 10:5–12(a).]

Proof of such discrimination involves a three-step process. *St. Mary's Honor Center v. Hicks, supra,* 509 *U.S.* at 506–08, 113 *S.Ct.* at 2747–48, 125 *L.Ed.*2d at 416–17; *Maiorino v. Schering–Plough Corp., supra,* 302 *N.J.Super.* at 346, 695 *A.*2d 353. First, plaintiff carries the burden of establishing by a preponderance of the evidence the elements of a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677 (1973). *See Erickson v. Marsh &*

---

[3] It seems also that, most likely triggered by the loss of the 1989 Allstate transaction, by October 1992 plaintiff was suffering from "a major depressive disorder" which impacted upon her ability to work.

*McLennan,* 117 *N.J.* 539, 550, 569 *A.*2d 793 (1990). That requires proof:

(1) that [plaintiff] is a member of a class protected by the anti-discrimination law; (2) that [plaintiff] was qualified for the position or rank [or employment benefits] sought; (3) that [plaintiff] was denied [such position rank or other benefit]; and (4) that others . . . with similar or lesser qualifications achieved the [benefits].

[*Dixon v. Rutgers, The State Univ. of N.J.,* 110 *N.J.* 432, 443, 541 *A.*2d 1046 (1988).]

*See Texas Dep't of Community Affairs v. Burdine,* 450 *U.S.* 248, 253, 101 *S.Ct.* 1089, 1094, 67 *L.Ed.*2d 207, 215 (1981) (recognizing the plaintiff's burden in establishing a *prima facie* case "is not onerous.").

Establishing a *prima facie* case of discrimination does no more than create a presumption that the employer unlawfully discriminated against the employee. *Stewart v. Rutgers, The State Univ.,* 120 *F.*3d 426, 432 (3rd Cir.1997). It then becomes the employer's task to overcome that presumption. That task is not one of a burden of proof; rather, it is simply one of coming forward with nondiscriminatory, legitimate reasons for the particular employment action. *Maiorino v. Schering–Plough Corp., supra,* 302 *N.J.Super.* at 345–47, 695 *A.*2d 353. *See St. Mary's Honor Center v. Hicks, supra,* 509 *U.S.* at 506–07, 113 *S.Ct.* at 2747, 125 *L.Ed.*2d at 416. This second-step of the analysis involves no credibility or truth assessment. Rather, the fact-finder accepts the employer's evidence at face value and does no more than determine whether it presents a nondiscriminatory legitimate reason, regardless of "whether ultimately persuasive or not." *Id.* at 509, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417. *And see Texas Dep't of Community Affairs v. Burdine, supra,* 450 *U.S.* at 254, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216; *Dixon v. Rutgers, The State Univ. of N.J., supra,* 110 *N.J.* at 442–43, 541 *A.*2d 1046.

The third, and clearly most critical, step of the analysis a fact-finder must perform is to determine whether the employer's professed nondiscriminatory rationale was, in truth, a mask or pretext for an improper discriminatory intent. That is the plaintiff's ultimate burden to prove. *Kelly v. Bally's Grand, Inc.,* 285

*N.J.Super.* 422, 430, 667 *A.*2d 355 (App.Div.1995). A plaintiff successfully meets this burden "by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine, supra,* 450 *U.S.* at 256, 101 *S.Ct.* at 1095, 67 *L.Ed.*2d at 217.

Because the first two steps of the analysis are relatively easy to meet, in most cases the focus of the inquiry for the fact-finder will be the third step. Indeed, usually, the *prima facie* case and defendant's production of some nondiscriminatory rationale are critical only in the context of a motion for summary judgment. *Id.* at 254 n. 8, 101 *S.Ct.* at 1094 n. 8, 67 *L.Ed.*2d at 216 n. 8. *See St. Mary's Honor Center v. Hicks, supra,* 509 *U.S.* at 516, 113 *S.Ct.* at 2752, 125 *L.Ed.*2d at 422 ("when the employer has met its burden of production 'the factual inquiry proceeds to a new level of specificity.' ... the inquiry now turns from the few generalized factors that establish a *prima facie* case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." (citation omitted)); *United States Postal Service Board of Governors v. Aikens,* 460 *U.S.* 711, 715, 103 *S.Ct.* 1478, 1482, 75 *L.Ed.*2d 403, 410 (1983) ("[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case ... [t]he ... court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.' On the state of the record at the close of the evidence, the ... [c]ourt ... should ... proceed[ ] to this specific question directly...." (citation omitted)).

Here, there is no dispute but that plaintiff had established a *prima facie* case of discrimination. Thus, although the jury charge contained a full discussion of that initial aspect of plaintiff's burden, the jury was not asked to return a separate verdict on that issue. The first question on the jury interrogatory relating to the claims against CB (question 2A) simply asked "[d]o you find

by a preponderance of the credible evidence ... [t]hat plaintiff was denied benefits relating to the Allstate transaction and/or by the resolution of the CBS dispute and/or the resolution of the Edwards and Kelsey dispute." We do not quarrel with removing the issue of a *prima facie* case from the jury. Indeed, the jury charge could well have, and probably should have, omitted any reference to plaintiff's *prima facie* burden as there was no dispute as to that for resolution. *Baker v. The National State Bank,* 312 *N.J.Super.* 268, 288, 711 *A.*2d 917 (App.Div.), *certif. granted,* 156 *N.J.* 425, 719 *A.*2d 1023 (1998) ("[f]ollowing *Burdine, Aikens,* and *Hicks,* many courts which have considered the issue have determined that, in an employment discrimination case, it is either unnecessary or incorrect to charge the jury on the elements and burden-shifting of the *prima facie* case." (citations omitted)).

This should have been so as to the second step of the analysis, that is whether CB presented evidence of legitimate, nondiscriminatory reasons for its actions. As we have said, that "burden" is both qualitatively and quantitatively different from plaintiff's ultimate burden of proof. It needs little to be satisfied and, at this stage of the analysis, implicates neither truth nor credibility. Neither, if objectively legitimate, is the fact-finder at liberty, at this stage, to reject the proffered reasons on the basis of his or her personal notions of legitimacy or reasonableness. CB's evidence, thus viewed, plainly was sufficient to satisfy its obligation at the second step.

Moreover, though this analysis may seem simple to us, it may not seem so to a juror who has had no prior experience with the rather peculiar nuances of this area of the law, particularly the differing burdens involved. Thus, where this is an issue to be resolved by the jury, we doubt that the conceptual and analytical differences between plaintiff's "burden of proof" and the employer's "burden of going forward" could be understood and correctly applied without some special guidance in the charge itself.

Here the jury instructions as to the second-step analysis of the discriminatory denial of employment benefits and discharge claims were as follows:

> If plaintiff proves by a preponderance of the credible evidence that she has stated an initial case by proving the necessary components as stated, the defendant then has the burden of going forward with evidence of legitimate non-discriminatory reasons for it's action, that action being such as denial of benefits, such as position or compensation.

These instructions contain no explanation of what the "burden of going forward" means. Particularly, they do not make clear that it is not a burden of proof.

We note our concern, too, of a statement in an earlier portion of the charge that "I charge you that all parties in this case have the burden of proving their allegations at trial." To be sure, various other parts of the charge properly refer to plaintiff's burden of proof and seem to make clear that the ultimate burden of persuasion is always hers. But this clearly incorrect statement, in conjunction with the absence of any explanation of CB's "burden of going forward" in that part of the charge before us, may well have resulted in a shifting of the burden of proof to CB at the second-step analysis.

Plaintiff points to the subsequent retaliatory discharge instructions which did contain language reflecting the difference between plaintiff's burden of proof and CB's burden of going forward. In this respect, the retaliatory discharge instructions told the jury that after plaintiff satisfies her *prima facie* burden on retaliatory discharge, "the burden of going forward *but not the burden of persuasion,* shifts to the employer to merely articulate some legitimate nonretaliatory reason for the adverse action. The *employer is not required to prove* the validity of such a reason *by a preponderance of the evidence* but need only articulate facts to produce evidence sufficient to raise a genuine issue of fact as to whether plaintiff was discriminated against." (Emphasis added). Assuming this language would have sufficiently clarified for the jury CB's proper obligation once plaintiff establishes a *prima facie* case had it been included in the critical portion of the charge before us, the jury, as reflected by the verdict, did not reach the retaliatory discharge claim and, thus, we can assume, did not focus upon the accompanying charge. Moreover, had it done so, the

omission of comparable language from the discriminatory employment benefits and discharge portion of the charge may well have further added to the confusion over precisely what CB's burden was at that point. Furthermore, the retaliatory discharge instruction, itself, repeats the notion that CB has a burden of persuasion by instructing that if plaintiff proved CB's reasons "unworthy of belief," then "the employer must prove by the preponderance of the credible evidence" that plaintiff would nonetheless have been discharged.

There is another aspect of the charge that is troublesome. As to the reasons proffered by CB, the charge instructed simply that:

Defendant maintains that it resolved the CBS and Edwards and Kelsey disputes and declined to place the plaintiff on the Allstate team and discharged plaintiff because of legitimate articulated reasons.

I charge you that *if true*, such articulated reasons constitute a legitimate non-discriminatory basis for defendant's actions.

[Emphasis added.]

To a juror, the qualifying statement "if true" would seem to mean that it is the function of the jury at that point to evaluate the credibility of the reasons. This is clearly an incorrect statement of the law. To be sure, had the jury reached the third-step of the process (pretext and intent), truth and credibility of the reasons would then have been a consideration. But the errors in the second-step analysis instruction are not without significance, in part because of the failure to make clear that the employer's burden at that point is not one of proof.

The jury interrogatories and verdict sheet further added to these misleading aspects of the charge. The first two questions concerning the claims against CB (questions 2A and B) were phrased in terms of whether the jury found by a preponderance of the credible evidence that plaintiff was denied benefits, without reference to either party's burden of proof. The third question (2C) asked "[d]o you find that defendant CB has articulated or advanced one or more legitimate non-discriminatory reasons for its decisions...." The ordinary sense of this inquiry would

require looking to CB to prove those reasons, perhaps by the preponderance of the credible evidence.

█ It was not until the third-step question (2D), that plaintiff's burden of proof was mentioned when the jury was asked "[d]o you find that plaintiff ... has proved by a preponderance of the evidence that defendant's legitimate non-discriminatory reasons were a pretext or a cover up for sex discrimination...." Without a doubt, this question, and the accompanying instructions,[4] conveyed the proper burden of proof. And jury interrogatories pursuant to *R.* 4:39–2 "are not grounds for a reversal unless they were misleading, confusing, or ambiguous." *Sons of Thunder, Inc. v. Borden, Inc.,* 148 *N.J.* 396, 418, 690 *A.*2d 575 (1997) (citations omitted). *See Geherty v. Moore,* 238 *N.J.Super.* 463, 474–77, 570 *A.*2d 29 (App.Div.1990), *appeal dism'd,* 127 *N.J.* 287, 604 *A.*2d 110 (1991). But, where they are given, the purpose of jury interrogatories should be " 'to require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury and, to clarify the meaning of the verdict and permit error to be localized.' " *Sons of Thunder, Inc. v. Borden, Inc., supra,* 148 *N.J.* at 419, 690 *A.*2d 575 (citation omitted).

The essential issue in this case was pretext and intent—the third-step of the fact-finder's analysis and the only step here which was at issue. Certainly the charge itself did not make this clear, neither did the interrogatories. Moreover, like the charge, the interrogatories not only failed to clarify the parties' respective burdens, but erroneously, albeit unintentionally, seem to place a burden of proof upon CB at the second-step of the analysis.

█ Of course, there is no reversible error "where the charge, considered as a whole, adequately conveys the law and is unlikely

---

[4] Those instructions included numerous statements of the plaintiff's burden to prove not only the pretext of the proffered nondiscriminatory reasons, but also the reminder that "anti-discrimination ... laws do not ... alter the traditional managerial prerogative to hire and fire employees....the plaintiff must prove by a preponderance of the evidence that her gender was a motivating factor in the defendant's adverse employment decision...."

to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect." *Fischer v. Canario,* 143 *N.J.* 235, 254, 670 *A.*2d 516 (1996). But few trial errors are more critical than those affecting the burden of proof. *See Feldman v. Lederle Laboratories,* 132 *N.J.* 339, 349, 352, 625 *A.*2d 1066 (1993); *D'Aries v. Schell,* 274 *N.J.Super.* 349, 362, 644 *A.*2d 134 (App.Div. 1994); *Blitz v. Hutchinson,* 252 *N.J.Super.* 580, 594, 600 *A.*2d 485 (App.Div.1991). The errors here are just such errors. *See Conklin v. Hannoch Weisman, P.C.,* 145 *N.J.* 395, 407, 409, 678 *A.*2d 1060 (1996) (retrial required in eleven-week jury trial as a result of an erroneous "single paragraph [on plaintiffs' proximate cause burden] contained in a sixty-seven page jury charge," and despite that entire charge otherwise contained the proper instructions, because "[c]onscientious jurors may have fastened their attention on the uncorrected portion of the charge and believed themselves bound by its literal terms...."); *Wanetick v. OCT Partnership,* 318 *N.J.Super.* 156, 167, 723 *A.*2d 100 (App.Div.1999) ("[w]hether [a] misstatement of law affected the jury verdict is not something we can be sure of. Because of this, and because we cannot countenance a clear misstatement of law regardless of its effect, we reverse and remand for a new trial."). *And see St. Mary's Honor Center v. Hicks, supra,* 509 *U.S.* at 511, 113 *S.Ct.* at 2749, 125 *L.Ed.*2d at 419 ("[b]ut the Court of Appeals' holding that rejection of the defendant's proffered reasons compels judgment for the plaintiff disregards the fundamental principle ... that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.' ").

These errors affect not only the claim for denial of employment benefits, but the claim for discriminatory discharge as well. Plaintiff's discharge claims were two-fold. She contended that her discharge was in retaliation for her complaints to management of the alleged discriminatory treatment in employment benefits. There was a separate jury charge on that claim and a separate set of jury questions. No errors are asserted in connection with this part of the charge and the verdict sheet. However, the jury never

reached the alternative claim of retaliatory discharge. Plaintiff also claimed discriminatory discharge because of her sex, similar to her claim of discriminatory denial of employment benefits. Although the verdict sheet contained a separate set of questions relating to this claim (questions 3A to 3E), there was not a separate charge. This is to say, the charge that we have previously discussed and concluded contained reversible errors, also encompassed the discharge based on sex claim. As the employer's second-step analysis is a critical part of that claim, and which the jury returned a verdict of "no" to, that verdict is also tainted by the charge.

Reversed and remanded for a new trial as to defendant CB. On retrial, assuming the evidence of plaintiff's *prima facie* case and CB's nondiscriminatory, legitimate reasons is comparable to what was presented in the first trial, the LAD liability portion of the jury charge, and the corresponding jury interrogatories as to denial of employment benefits and discharge based on sex, should focus only on the pretext and intent analysis.